501 F.2d 622
 8 Fair Empl.Prac.Cas. 293, 8 Empl. Prac. Dec. P 9488
George RIOS et al., Plaintiffs-Appellees,
v.
ENTERPRISE ASSOCIATION STEAMFITTERS LOCAL 638 OF U.A. et
al., Defendants-Appellants.
UNITED ATATES of America, Plaintiff-Appellee.
v.
ENTERPRISE ASSOCIATION STEAMFITTERS LOCAL 638 OF U.A. et
al., Defendants-Appellants.
 Nos. 647, 834, Docket 73-2110, 73-2266.
 United States Court of Appeals, Second Circuit.
 Argued March 12, 1974.
Decided June 24, 1974.
 
 Richard S. Brook, New York City (Ernest Fleischman, Delson & Gordon, New York City, of counsel), for defendand-appellant Enterprise Assn. Steamfitters Local 638 of U.A.
 Dennis R. Yeager, New York City (E. Richard Larson, Marilyn R. Walter, New York City, of counsel), for plaintiffs-appellees George Rios, and others.
 Joel B. Harris, Asst. U.S. Atty. (Paul J. Curran, U.S. Atty., S.D.N.Y., Steven J. Glassman, Asst. U.S. Atty., New York City, of counsel), for plaintiff-appellee United States.
 Before HAYS and MANSFIELD, Circuit Judges, and DAVIS, Judge.*
 MANSFIELD, Circuit Judge:
 
 
 1
 Once again we are confronted with questions arising out of the imposition of a specific racial membership goal upon a union as a means of dissipation the effects of its past discrimination against minority applicants for membership. See, e.g., United States v. Wood, Wire & Metal Lathers International Union, Local Union No. 46, 471 F.2d 408 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973). The present appeal is by Local 638, Enterprise Association of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Compressed Air, Ice Machine, Air Conditioning and General Pipefitters (the 'Union') from certain provisions of an Order and Judgment entered on June 21, 1973, after the consolidated trial of two actions in the Southern District of New York before Judge Dudley B. Bonsal, sitting without a jury. The portions of the Order appealed from relate to the admission of 'non-whites' into Union membership and into a joint employerunion apprenticeship program. The term 'non-white' as so used is defined to mean black and Spanish sur-named workers. We remand the case for the purpose of reestablishing the percentage goals upon the basis of relevant statistical data. Subject to such modification the Order and Judgment are affirmed.
 
 
 2
 Two actions were consolidated for trial purposes by the district court. One is a suit filed by the government in 1971 under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., against the Union and others to enjoin a pattern and practice of discrimination against non-whites in the construction industry. Joined as defendants were (1) several local construction unions, including Local 638, each of which represents a different branch of workers in the industry, (2) joint apprenticeship committees for the different branches, and (3) various associations of employers in the industry. Separate trials were ordered of the claims against each Union. On January 3, 1972, after a three-day hearing on the government's application for preliminary injunctive relief, Judge Bonsal found that the Union had unlawfully discriminated in the past against non-whites, failing among other things to admit some 169 qualified non-white workers to membership. 337 F.Supp. 217 (S.D.N.Y.1972). He ordered the Union to admit them and temporarily enjoined a strike protesting an employer's non-discriminatory action in laying off white and non-white workers when the work force was reduced upon the completion of a construction job. No appeal was taken from his findings, conclusions or order.
 
 
 3
 The government's suit against the Union was consolidated for trial purposes with a class action against the Union and others by four non-white workers (known as the 'Rios' action) claiming that the Union, the Mechanical Contractors Association of New York, Inc. ('MCA') and the Joint Steamfitters Apprenticeship Committee of the Steamfitters Industry ('JAC') had failed to admit non-whites to membership, had refused non-whites access to the steamfitters' apprenticeship program on the same basis as whites, and had failed to provide non-whites with equal job opportunities, all in violation not only of Title VII of the Civil Rithts Act of 1964, 42 U.S.C. 2000e et seq., but also of 42 U.S.C. 1981 and 1983, and of the Fifth and Fourteenth Amendments. Prior to the consolidation of the Rios and government suits Judge Frankel, after hearing the application of the Rios plaintiffs for preliminary injunctive relief in their action, found, in an opinion filed on March 24, 1971, 326 F.Supp. 198, that the Union 'had followed a course of racial discrimination over the years,' which had had the effect, among others, of wrongfully excluding three of the plaintiffs from membership in the Union. By was of preliminary relief the Union was ordered to admit the three to membership. No appeal was taken by the Union from this preliminary injunction.
 
 
 4
 Following the consolidated trial Judge Bonsal, in detailed findings and conclusions issued on June 21, 1973, 360 F.Supp. 979, found that, although the Union had taken some affirmative action since the entry of the preliminary injunction to increase non-white participation in the construction industry (principally by joining in a joint industry program called the 'New York Plan,' which sought to recruit and find jobs for minority employees), it had continued its pattern and practice of discrimination against non-whites by failing to admit them to full journeyman status, by discriminating against them in work referral, and by participating in an apprenticeship program which discriminated agaist them.
 
 
 5
 In an Order and Judgment filed with his opinion the district judge enjoined the defendants from discriminating against individuals on the basis of race, color or national origin and directed the Union to receive and process applications for membership and references for employment and to administer its affairs in a nondiscriminatory manner. The Order appointed an Administrator, Vincent McDonnell, Esq., to implement its provisions and to supervise performance by the parties. The defendants were directed, within three months of the date of the Order, to submit to the Administrator an 'affirmative action program' designed to secure the admission of a sufficient number of nonwhites to membership as journeymen in the Union's A Branch 'to achieve a minimum goal of 30% Non-white membership by July 1, 1977.' (Members of the Union's 'A Branch' perform construction steamfitting work and generally receive higher hourly earnings than do members of the 'B Branch,' who perform shop or repair work.) With a view to achieving the prescribed 30% Goal, guidelines were established for direct admission to the A Branch membership and for the administration of the apprenticeship program, subject to such changes as might later be approved by the Administrator and the court.
 
 
 6
 The Order further directed that, during the three-month period following its issuance, certain 'Transitory Provisions' were to be observed by the Union. During this period the Union was directed to admit only (1) graduates of the Apprenticeship Program and (2) non-whites who had met certain experience or certification requirements or who had successfully completed a practical examination to be administered by a Board of Examiners. The Board, which was authorized to act by majority rule, consisted of the Administrator or his representative, a representative of the Union, and one chosen by the Administrator from a 'minority referral' source. The Order required the defendants, within five days after its effective date, to submit a form of such practical examination for approval by the court and to administer the examination once a month, after such approval, giving advance notice to each applicant.
 
 
 7
 The Order further established temporary procedures for an apprenticeship training program during the period prior to adoption by the court of the 'affirmative action program.' It specified that during 1973 there should be a minimum of 400 apprentices, of whom 175 should be non-white, indentured into a program not to exceed four years. Any additional apprentices must be indentured on the basis of one non-white for every white.
 
 
 8
 The parties submitted to the Administrator their proposals for and comments with respect to an 'affirmative action program' that would incorporate permanent relief with respect to admissions to membership and administration of the apprenticeship program. On March 29, 1974, the district court adopted an 'Affirmative Action Plan' (the 'Plan'), which generally implements the terms of the court's Order. The Plan continues Mr. McDonnell in office as Administrator until July 31, 1977, and directs that the minimum goal of 30% Non-white membership in the A Branch shall be achieved in stages, 15% By July 15, 1974, 20% By July 15, 1975, 25% By July 15, 1976 and 30% By July 1, 1977. The categories of A Branch members to be used as the measure for determining these goals are defined, with the direction that the goals are to be met through (1) a four-year apprenticeship program, (2) direct admission to the A Branch, and (3) other trainee programs. Detailed standards and conditions are fixed for admission of non-whites to the first two of these categories, the Plan directing that a minimum of 100 non-whites shall be indentured into the apprenticeship program each year through 1977 and that a practical examination for admission to the A Branch shall be given weekly or at such other intervals as are approved by the Administrator, upon at least two weeks notice to applicants. The three-person Board of Examiners, which is authorized to act by majority vote and to determine the results of each examination, is to consist of the Administrator or his representative, a Union representative and a representative of the 'non-white community' chosen by the Administrator. The Union and employers are also encouraged to develop and participate in non-white trainee programs. Aside from the foregoing, perhaps the most significant term of the Plan is its provision that if the Administrator determines that the minimum goals may not be met by the foregoing methods he may require direct admission to the A Branch on terms approved by himself and the court.
 
 
 9
 No appeal has neen taken from the district court's findings and conclusions or from most of the provisions of the Order and Judgment, including the broad equitable relief granted, the appointment of the Administrator, the definition of his powers, and the general provisions with respect to work referral, back pay, attorneys' fees, costs and continuing jurisdiction. The Union, however, appeals from six specific provisions of the Order:
 
 
 10
 (1) its provision for an affirmative action program (since adopted) to achieve a minimum goal of at least 30% Non-white membership by July 1, 1977 (Par. 8);
 
 
 11
 (2) its grant of authority to the Administrator to determine the size and frequency of apprenticeship classes and requirement that at least 30% Of those indentured for each year for the year 1974 through 1977 shall be non-white, subject to a determination by the Administrator that a greater percentage of non-white apprentices may be necessary to achieve the minimum 30% Goal (Par. 9(b)(ii));
 
 
 12
 (3) its provision that during the three-month transitory period following entry of the Order non-white applicants for membership might satisfy the four years experience requirement by including their experience in specified work of a related nature (Par. 11(a));
 
 
 13
 (4) its establishment of a board of three examiners who are authorized, by a majority vote, to administer the practical examination to be given to applicants;
 
 
 14
 (5) its provision that from the expiration of the three-month transitory period until the adoption of the affirmative action plan applicants for full journeyman membership in the A Branch must be accepted on a 'one-for-one' basis, i.e., one non-white for each white (Par. 12);
 
 
 15
 (6) the requirement that the practical examination be administered 'at least once every month' (Par. 13).
 
 
 16
 Since the facts are set forth in detail in Judge Bonsal's opinion, 360 F.Supp. 979, we limit ourselves to a summary of those aspects essential to consideration of the Union's challenge of the foregoing provisions.
 
 
 17
 The Union is a labor organization representing its members as their collective bargaining agent in arriving at terms and conditions of employment with steamfitting contractors and contractor-associations in the five boroughs of New York City and in Nassau and Suffolk Counties. It has two branches: (1) the A Branch, whose members are journeymen engaged in construction work on building sites and (2) the B Branch, a metal trades division, whose members work in shops or perform repair work. Membership in the Union is of substantial aid to a worker in obtaining a job as a construction steamfitter and in gaining advancement and overtime pay. Although the Union does not operate a hiring hall, it does refer workers to jobs upon learning of openings. Contractors in the steamfitting industry maintain steady crews which are shifted from site to site as construction needs change. Workers and the Union learn of job openings through those employed on different sites or through employers' foremen or superintendents.
 
 
 18
 All past and present officers and business agents of the Union have been white. Prior to 1967 there were no non-white journeymen in the A Branch. By the end of 1971, there were 3,850 A Branch members, of whom only 31 were non-white, and by the end of 1972 approximately 4.5% Of the membership, or 191 out of 4,198 A Branch members, were non-white. For the most part even this small non-white membership was achieved as a result of the preliminary relief granted by the court. Until that time the Union's use of irregular and informal admissions procedures had resulted in almost complete and systematic exclusion of non-white applicants for journeyman membership, while whites were admitted, with some preference apparently given to relatives of existing members. Approximately 25% Of the A Branch have been admitted through a five-year apprenticeship program administered by the JAC, the members and employees of which are all white. As a result of the JAC's use of discriminatory requirements for admission into the program, no non-white applicants were admitted prior to 1964 and, since that time, of 492 apprentices indentured 94.3% Have been white. At the time of trial only 16 of the 376 participants in the apprenticeship program were non-white.
 
 
 19
 The district court concluded that it was unnecessary to determine whether the Union had engaged in purposeful discrimination against admission of non-whites to the A Branch since the Union had a history of de facto discrimination, with the results of past discrimination being perpetuated. In short, non-white access to membership, either directly or through the apprenticeship route, has been almost completely blocked until the last two years when a very small percentage of non-white membership has been achieved, but otherwise the effects of past discrimination have continued. As against the miniscule percentage of non-white members in the Union, reliable statistical sources revealed that blacks and Puerto Ricans constituted (1) 25.09% Of the total population in the seven counties in which the Union has jurisdiction,[1] and (2) 19.79% Of the work force in that area.[2]
 
 
 20
 In light of the foregoing background, described in detail in his opinion, Judge Bonsal concluded that affirmative relief was required to combat the continuing effects of past discriminatory practices, and entered the Order and Judgment forming the subject of the present appeal.
 
 DISCUSSION
 
 21
 Appellants argue that the court's imposition of a racial goal[3] violates 703(j) of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2(j), and the Due Process and Equal Protection Clauses of the Constitution. However, we have recently considered and rejected the same arguments in similar cases, see, e.g., United States v. Wood, Wire and Metal Lathers International Union, Local 46, 471 F.2d 408, 412-413 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 .l.Ed.2d 398 (1973); Vulcan Society of New York City Fire Department, Inc. v. Civil Service Commission, 490 F.2d 387, 398-399 (2d Cir. 1973); Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission, 482 F.2d 1333, 1340-1341 (2d Cir. 1973), and nothing has neen advanced that would lead us to depart from the principles of those decisions, which directly apply here.[4]
 
 
 22
 Once a violation of Title VII is established, the district court possesses broad power as a court of equity to remedy the vestiges of past discriminatory parctices. See United States v. Wood, Wire and Metal Lathers International Union, Local 46, supra, and cases cited therein 471 F.2d at p. 413. The Civil Rights Act of 1964 provides that upon finding that a respondent has engaged in an unlawful employment practice the court has the authority not only to enjoin continuation of the practice but also to order 'affirmative action' which may include such 'equitable relief as the court deems appropriate,' 42 U.S.C. 2000e-5(g). The Act further empowers the Attorney General, in a civil suit (such as that instituted here against the Union) which charges a pattern or practice of discrimination, to seek such relief against the defendants 'as he deems necessary to insure the full enjoyment of the rights herein described,' 42 U.S.C. 2000e-6(a). 'Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices.' Griggs v. Duke Power co., 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). In addition to the powers expressly granted by the Civil Rights Act, the court possesses the equitable power, upon finding any unlawful discrimination, to 'eliminate the discriminatory effects of the past as well as bar like discrimination in the future,' Louisiana v. United States, 380 U.S 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965).
 
 
 23
 Eight circuits, including our own, have construed this delegation of broad equitable power as authorizing the district court to establish goals for the purpose of remedying the effects of past discriminatory conduct. See United States v. Wood, Wire and Metal Lathers International Union, Local 46, supra; Associated Gen. Contractors of Mass. Inc. v. Altshuler, 361 F.Supp. 1293 (D.Mass.), affd., 490 F.2d 9 (1st Cir. 1973), cert, denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974); Pennsylvania v. O'Neill, 473 F.2d 1029 (3d Cir. 1973) (en banc); Contractors Assn. of Eastern Pa. v. Secretary of Labor, 442 F.2d 159 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); Morrow v. Crisler, 491 F.2d 1053 at 1055 (5th Cir. Mar. 27, 1974); Local 53 Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969); United States v. Local 212, IBEW, 472 F.2d 634 (6th Cir. 1973); United States v. IBEW Local 38, 428 F.2d 144 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); United States v. Carpenters Local 169, 457 F.2d 210 (7th Cir.), cert. denied, 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972); United States v. N.L. Industries, Inc., 479 F.2d 354 (8th Cir. 1973); United States v. Ironworkers Local 86, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).[5] Despite the existence of some tension between the constitutional mandate of non-discrimination, on the one hand, and the use of goals as a kind of 'reverse discrimination,' on the other,[6] the Supreme Court has recognized that 'mathematical ratios,' although forbidden if specified as a permanent or 'inflexible requirement,' may serve as a 'useful starting point in shaping a remedy to correct past constitutional violations,' Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 25, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971).
 
 
 24
 At first blush a court-ordered racial goal might appear to violate the language of 703(j) of the Civil Rights Act which provides that the Act shall not be interpreted to require an employer 'to grant preferential treatment to any individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race . . . in comparison with the total number or percentage of persons of such race . . . in any community.'[7] However, as we indicated in United States v. Wood, Wire and Metal lathers International Union, Local 46, supra, that language was intended to bar preferential quota hiring as a means of changing a racial imbalance attributable to causes other then unlawful discriminatory conduct. It does not prohibit the use of goals 'to eradicate the effects of past discriminatory practices.' Our interpretation has been shared by others. See, e.g., United States v. Ironworkers, Local 86, 443 F.2d 544, 553-554 (9th Cir.), cert, denied, 404 U.S. 984,92 .s.Ct. 447, 30 L.Ed.2d 367 (1971); Contractors Assn. of Eastern Pa. v. Secretary of Labor, 442 F.2d 159 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct 98, 30 L.Ed.2d 95 (1971); United States v. IBEW, Local 38, 428 F.2d 144, 149-150 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970) ('. . . that section (703(j)) cannot be construed as a ban on affirmative relief against continuation of effects of past discrimination . . .. Any other interpretation would allow complete nullification of the stated purposes of the Civil Rights Act of 1964.').
 
 
 25
 Where a racial imbalance is unrelated to discrimination, 703(j) recognizes that no justification exists for ordering that preference be given to anyone on account of his race or for altering an existing hiring system or practice. But where the imbalance is directly caused by past discriminatory practices it is readily apparent that if the rights of minority members had not been violated, many more of them would enjoy those rights than presently do so and that the ratio of minority members enjoying such rights would be higher. No longer are we dealing with an 'imbalance' attributable to non-discriminatory causes. The effects of such past violation of the minority's rights cannot be eliminated merely by prohibiting future discrimination, since this would be illusory and inadequate as a remedy. Affirmative action is essential. Since the nature and extent of such action depends on the facts of each case, it must of necessity be left to the sound discretion of the trial judge, who may in one case find that broad equitable relief will suffice to restore the balance but in another conclude that use of a more specific remedy is required.
 
 
 26
 Appellants further argue while such goals may be permissible in the field of public employment they should be barred as a means of curing past discrimination in private enterprise. No rational basis is offered for drawing such a distinction. That private violations of civil rights should be remediable has been recognized at least since the enactment of the Civil Rights Act of 1866, 42 U.S.C. 1981. Since the harm caused by private violations can be at least as serious as that resulting from conduct of public bodies or officials, the relief must be commensurate with the injury to be remedied.
 
 
 27
 Nor are remedial goals limited to any specific or prescribed form. The precise method of remedying past misconduct is left largely to the broad discretion of the district judge. Goals have been expressed in terms of specific numbers or ratios, United States v. Wood, Wire and Metal Lathers International Union, Local 46, supra (minimum of 100 work permits to be issued to non-whites; 250 permits to be issued annually on a 'one-to-one' basis, black to white, through 1975); Vulcan Society v. Civil Service Commission, supra (ratio of 3 whites to 1 minority candidate established for a specific period); Carter v, Gallagher, 452 F.2d 315, 331 (8th Cir. 1971) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 .l.Ed.2d 338 (1972) (1 minority fireman for every 2 whites hired); Pennsylvania v. O'Neill, 348 F.Supp. 1084 (E.D.Pa.1972), modified en banc, 473 F.2d 1029 (3d Cir. 1973) (1 black for every 2 whites hired), or percentages, Bridgeport Guardians v. Bridgeport Civil Service Commission, supra (specific numbers of minority patrolmen to be appointed in order to achieve 15% Goal). Goals have also been mandated with respect to apprenticeship programs, United States v. Ironworkers Local 86, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 . l.Ed.2d 367 (1971) (union ordered to recruit 30% Black apprentices, with minimum number per year).
 
 
 28
 Applying these principles here the undisputed facts justified the district court's grant of more drastic relief than a mere prohibition against future discriminatory conduct on the Union's part. The court's findings, which are not controverted, disclose a pattern of long-continued and egregious racial discrimination which permeated the steamfitting industry, precluding qualified non-white applicants from gaining membership in the Union's A Branch and maintaining it as a 'white' union. The Union has failed completely to demonstrate that its discriminatory practices could be justified on legitimate grounds such as safety considerations or the high level of skill required of Union members. Nor has the Union, despite the opportunity afforded after the issuance of preliminary relief, voluntarily 'cleaned house' or taken any meaningful steps to eradicate the effects of its past discrimination. Under the circumstances the imposition of remedial goals was not an abuse of discretion.
 
 
 29
 There remains the question whether the 30% Goal fixed by the court exceeded the bounds of its discretion. In considering that issue we must be guided by the principle that the objective of a remedial quota is a limited one. It seeks to place eligible minority members in the position which the minority would have enjoyed if it had not been the victim of discrimination. Of course any attempt to reconstruct what would have happened in the absence of discrimination is fraught with considerable difficulty. But the court is called upon to do the best it can with the data available to it. Cf. Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-265, 6 S.Ct. 574, 90 L.Ed. 652 (1946). In the present case it is undisputed that a certain percentage of the total labor force within the Union's territorial jurisdiction would, in the absence of discriminatory practices, have been eligible for membership in the Union's A Branch, either directly or through the apprenticeship program. The district court apparently concluded that 30% Of the membership would have been non-white, absent discriminatory practices. The record is unclear as to the source of the 30% Figure. The trial judge's comments at one point during the proceedings indicate that the figure was prompted by regulations recently proposed by the Deputy Mayor-City Administrator of the City of New York, which set a goal of 28% 'minority' steamfitters to be reached by June 30, 1977.[8] However, this proposed figure (which is not part of the record below) was based on a definition of the term 'minority' which includes not only Negroes and Spanish sur-named Americans but Orientals, American Indians and, where appropriate, females and other classes of individuals which have been the subject of past discriminatory practices. The City's proposal was also based on the minority composition of the five boroughs of New York City, whereas we are here dealing with a larger area which includes, in addition, Nassau and Suffolk where the non-white percentage of the population is smaller than in New York City. The district court's opinion further indicates that the selection of the 30% Goal may also have been influenced by statistics taken from the 1970 census, which 'indicate the non-whites constitute approximately 25.09% To 30.06% Of the total population of New York City and Nassau and Suffolk Counties,' 360 F.Supp. at 992. The membership of the A Branch, however, is not drawn from the entire population. It has consisted of male workers over 18 years of age. Women have never sought to become steamfitters. See opinions of Judge Frankel in Rios, 326 F.Supp. at 202, and of Judge Gurfein in United States v. Local 638 Enterprise Association, 347 F.Supp. at 174 n. 4. Persons under 18 years of age, white or non-white, do not appear to have been admitted into the Union or into the apprenticeship program. Absent racial discrimination, therefore, the non-white members of the Union would have been drawn from the male work force over 18 years of age in the Union's jurisdiction.
 
 
 30
 Statistics as to the population of this work force during the pertinent period should provide a more accurate base than total population statistics for determining what would have been the percentage of non-white membership, absent discrimination, in the Union. The record reveals that such figures were made available to the district court in May 1973 before its decision and were accepted by it. These figures appear in tables published by the United States Department of Commerce in a publication entitled General Social and Economic Characteristics, 1970 Census of Population-- New York, which show that 19.79% Of the total labor work force over 16 years of age in the area over which the Union has jurisdiction consisted of black and Puerto Rican males. These figures are not perfect for present purposes, since they do not include all Spanish sur-named persons, they do include some persons under 18 years of age, and they do not give the percentages for other years during the period of the alleged discrimination. However we believe that reliable statistics with respect to the labor force provide a more accurate basis for arriving at an appropriate non-white percentage goal than does the information relied upon by the district court, which included not only males forming the labor force, but females, children, retired persons and others who would not, absent discrimination, have been the source of Union members or apprentices.
 
 
 31
 Judge Bonsal did recognize that it might be necessary to change the 30% Figure 'if during the course of the next four years it turns out that the population figures don't justify it' (Appendix 388). However, we believe that from the outset the court should be guided by the most precise standards and statistics available in view of the delicate constitutional balance that must be struck in the use of such goals or quotas between the elimination of discriminatory effects, which is permissible, and the involvement of the court in unjustifiable 'reverse racial discrimination,' which is not. See United States v. Ironworkers Local 86, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). These conflicting considerations make it essential that the percentage figure be reached with the utmost of care, since once the goal is reached the party will thereafter be bound by standards of non-discrimination applicable to all and not forced to continue in effect a percentage ratio that could become anachronistic. The district court's role in prescribing non-white goals must at all times be limited to eradication of past discrimination. To prescribe a goal based on an anticipated future increase in the non-white percentage of the population or of the work force would be to cross the line from lawfully remedying the effects of past discrimination to an unlawful attempt to maintain a future non-white percentage.
 
 
 32
 In view of the district court's apparent reliance upon figures of questionable relevance and its failure to define the basis for the 30% Goal, we remand for reassussment of the percentage goal figure. Upon remand the district court may, for reasons articulated by it, satisfactorily explain the rationale for its 30% Goal or it may conclude that a lower percentage is appropriate.
 
 
 33
 We find no merit in the other points raised by appellants. Their argument that the percentage goal fixed by the court will create unemployment is at best speculative and ignores the necessity of curing the effects of past discrimination by providing equal work opportunities to the non-white minority. Furthermore, should the 30% Figure be reduced upon remand, any unemployment threat would, of course, be proportionately alleviated. Since the threemonth period following the district court's Order has expired and an affirmative action plan has been adopted by the court, appellants' attack on interim measures prescribed by the Order (see Pars. 11(a) and 12) has been rendered moot, at least insofar as they form the basis for a challenge of the temporary relief granted by the court. Doremus v. Board of Education, 342 U.S. 429, 432433, 72 S.Ct. 394, 96 L.Ed. 475 (1952). The Order's provisions for a journeyman selection procedure, which require periodic administration of practical examinations by a Board of Examiners, are reasonable and well within the district court's discretion. Chance v. Board of Examiners, 458 F.2d 1167, 1178 (2d Cir. 1972). The criteria established by the district court for selecting A Branch members appear to be both reasonable and objective. In view of the Union's history of discrimination the establishment of a Board of Examiners was appropriate.
 
 
 34
 The Order of the district court is remanded for reassessment and recalculation of the percentage goal for nonwhite membership in the Union. Subject to such modification of the Order as may be made consistently with this opinion, the Order and Judgment are affirmed.
 
 
 35
 HAYS, Circuit Judge (dissenting): I dissent.
 
 
 36
 I would vacate paragraphs 8 and 9(b)(ii) of the district court's order. Paragraph 8 requires the Steamfitters Union to have at least 30 percent Spanish-speaking and Negro membership by 1977, and paragraph 9(b)(ii) requires that at least 30 percent of the persons entering Steamfitters apprenticeship classes each year be Black or Spanishspeaking. Both paragraphs violate sections 703(j) and 703(c)(1) of the Civil Rights Act of 1964, 42 U.S.C. 2000e2(j), 2000e-2(c)(1) (1970).
 
 
 37
 The majority acknowledges that 'at first blush a court-ordered racial goal might appear to violate the language of 703(j) of the Civil Rights Act,'[1] but it concludes that section 703(j) does not prohibit quotas designed 'to eradicate the effects of past discriminatory practices.' This conclusion is supported by neither the text nor the legislative history of section 703(j).
 
 
 38
 The majority's failure to point to any textual justification for its position can be traced to the fact that section 703(j) speaks in sweeping terms, forbidding all preferential treatment. In relevant part, it provides as follows:
 
 
 39
 'Nothing contained in (Title VII) shall be interpreted to require any . . . labor organization . . . subject to this (Title) to grant preferential treatment to any individual . . . because of the race, color, religion, sex, or national origin of such individual . . . on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin . . . in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community . . ..' 42 U.S.C. 2000e-2(j) (1970).
 
 
 40
 Section 703(j) thus prohibits preferential treatment of any individual on account of racial imbalance in a union's membership. It is not concerned with the causes of imbalance, past, present, or future. It provides for no exception from its broad prohibition for imbalances caused by past discrimination. It simply removes racial preferences from the otherwise broad category of equitable relief available to a district court in a Title VII case.
 
 
 41
 The legislative history of Title VII lends no support to the distinction advanced by the majority. Rather, it emphasizes that Congress intended section 703(j) to mean exactly what it says: that under no circumstance does Title VII require or authorize the imposition of racial employment quotas as a remedial device.
 
 
 42
 The bill that became the Civil Rights Act of 1964 originated in the House of Representatives as H.R. 7152. As it was reported to the House by the House Judiciary Committee, H.R. 7152 did not contain section 703(j). See H.R.Rep.No.914, 88th Cong., 1st Sess. 10 (1963). Nevertheless, various members of Congress in the majority of the Judiciary Committee that supported the Civil Rights Act stated in a separate report[2] that they viewed Title VII as a means of opening doors to employment for all qualified people, rather than as a means of setting employment quotas:
 
 
 43
 'It must also be stressed that the (Civil Rights) Commission must confine its activities to correcting abuse, not promoting equality with mathematical certainty . . .. Its primary task is to make certain that the channels of employment are open to persons regardless of their race and that jobs in companies or membership in unions are strictly filled on the basis of qualification.' H.R.Rep.No.914 Pt.2, 88th Cong., 1st Sess., Additional Views of Congressmen McCulloch, Lindsay, Cahill, Shriver, MacGregor, Mathias, and Bromwell at 29 (1963).
 
 
 44
 After H.R. 7152 passed the House, 110 Cong.Rec. 2805 (1964), it went directly to the floor of the Senate, bypassing the usual committee procedure. U.S.E.E.O.C., Legislative History of Titles VII and XI of Civil Rights Act of 1964 at 10. The proceedings in the Senate were the object of intense national interest. The opponents of the civil rights bill launched a filibuster that lasted 83 days. See generally id.; 110 Cong.Rec. 4742-14511 passim. One of the prime targets of the opponents was Title VII, which they claimed would impose on unions and employers a federally-administered racial quota system. The tenor of their argument is captured in the remarks of Senator Smathers:
 
 
 45
 '(Under Title VII) every employer will have to have someone on his staff whose job will be to determine what percentage each minority group constitutes in the total population; and he will have to employ so many of each minority.' Remarks of Senator Smathers, 110 Cong.Rec. 8175 (1964).
 
 
 46
 See also Remarks of Senator Smathers, 110 Cong.Rec. 7791, 8500 (1964); Remarks of Senator Tower, 110 Cong.Rec. 7778-80, 8180 (1964).
 
 
 47
 The floor leaders in the campaign to enact H.R. 7152 acknowledged the undesirability of racial hiring quotas, but even before section 703(j) was added to the bill they adamantly maintained that Title VII made illegal any consideration of race in employment or union membership, including racial quotas favoring minorities. For example, Senator Williams remarked that
 
 
 48
 'to hire a Negro solely because he is a Negro is racial discrimination, just as much as a 'white only' employment policy. Both forms of discrimination are prohibited by title VII of this bill. The language of that title simply states that race is not a qualification for employment. Every man must be judged according to his ability . . .. Those who say that equality means favoritism do violence to commonsense.' 110 Cong.Rec. 8921 (1964).
 
 
 49
 Senator Williams went on to draw an analogy between Title VII and jury discrimination cases:
 
 
 50
 'The Supreme Court has ruled, in numerous cases, that racial discrimination in the selection of juries is unconstitutional . . .. But this does not mean that every jury must contain a Negro. The Court's decision does not establish quotas for juries . .. In fact, the Supreme Court has flatly rejected the notion that there must be racial quotas for juries. (Citing Akins v. Texas, 325 U.S. 398 (65 S.Ct. 1276, 89 L.Ed. 1692) (1945)).
 
 
 51
 'What is true in the case of juries is also true in the area of employment. H.R. 7152 does not require that every employer with more than 25 employees hire a Negro or a certain percentage of Negroes.' Id.
 
 
 52
 Senator Williams was not alone in this view. Other leaders among the proponents of H.R. 7152 repeatedly stated that Title VII, even before section 703(j) was added by amendment, prohibits quotas favoring minorities. The floor managers of H.R. 7152 reported to the Senate that
 
 
 53
 'there is no requirement in title VII that an employer maintain a recial balance in his work force. On the contrary, any deliberate attempt to maintain a racial balance, whatever such balance may be, would involve a violation of title VII because maintaining such a balance would require an employer to hire or to refuse to hire on the basis of race.' Interpretive Memorandum of Title VII of H.R. 7152 Submitted Jointly by Senators Clark and Case, Floor Managers, 110 Cong.Rec. 7212, 7213 (1964).
 
 
 54
 See also Note, Employment Testing: The aftermath of Griggs v. Duke Power Company, 72 Colum.L.Rev. 900, 924 (1972).
 
 
 55
 To neutralize the argument that Title VII would lead to racial quotas, Senator Allott introduced Amendment Number 568, which contained the substance of the present section 703(j). Senator Allott stated that the purpose of Amendment 568 was to make it clear that Title VII makes ability the sole criterion for hiring, that it does not permit racial quotas:
 
 
 56
 '. . . I do not believe title VII would result in imposition of a quota system. Further, I believe that a quota system of hiring would be a terrible mistake, not only from the viewpoint of the employer, but from the viewpoint of the employee-- from the viewpoint of the minority as well as the majority. Basically, I believe that the color of a man's skin, or the faith to which he adheres, should be completely extraneous considerations when an employer hires or a labor union admits to membership . . ..
 
 
 57
 'But the argument has been made, and I know that Employers are also concerned with the argument. I have, therefore, prepared an amendment (No. 568) which I believe makes it clear that no quota system will be imposed if title VII becomes law.' 110 Cong.Rec. 9881 (1964).
 
 
 58
 While H.R. 7152 was being debated, a series of amendments, the so-called Dirksen-Mansfield substitute, was drafted by a group of the supporters of H.R. 7152 in consultation with the Justice Department. U.S.E.E.O.C., supra at 10-11; 110 Cong.Rec. 12706-07 (1964). Among these amendments was the present text of section 703(j). When the Dirksen-Mansfield substitute was put before the Senate, one of its drafters, Senator Humphrey, explained the purpose of section 703(j) as follows:
 
 
 59
 'A new subsection 703(j) is added to deal with the problem of racial balance among employees. The proponents of this bill have carefully stated on numerous occasions that title VII does not require an employer to achieve any sort of racial balance in his work force by giving preferential treatment to any individual or group. Since doubts have persisted, subsection (j) is added to state this point expressly.' Remarks of Senator Humphrey, 110 Cong.Rec. 12723 (1964).
 
 
 60
 The Dirksen-Mansfield substitute was adopted by the Senate on June 17, 1964, and by the House on July 2, 1964. See U.S.E.E.O.C., supra at 11.
 
 
 61
 The legislative history of section 703(j) makes it abundantly clear that Congress intended Title VII to require unions and employers to accept members and to hire employees without regard to race. Quotas, for whatever reason imposed, fly in the face of that intent. Nowhere in the comprehensive reports of the House Judiciary Committee, and nowhere in the 534 hours of Senate debate is there as much as an oblique suggestion that Congress intended to permit court-ordered racial quotas 'to eradicate the effects of past discriminatory practices.' On the contrary, the prohibition against racial preference in section 703(j) is comprehensive. The majority's ruling today completely fails to give effect to that prohibition.
 
 
 62
 The majority finds that the district court's quotas are justified by Title VII's mandate that a court must order 'affirmative action,' including such equitable relief as the court deems appropriate, where necessary to redress unlawful employment practices. Civil Rights Act of 1964 706(g), 42 U.S.C. 2000e-5(g)(1970). But the majority does violence to common sense and disregards the ordinary meaning of the language used when it interprets the general delegation of power found in section 706(g) as controlling the specific limitation on power found in section 703(j). On the contrary it is clear that section 703(j) limits the remedies under section 706(g). Although a district court can, and in fact must, order such affirmative action as is necessary to eliminate unlawfully discriminatory employment practices, it may not order that such practices be instituted.
 
 
 63
 'Affirmative' remedies to correct abusive practices are by no means lacking when section 706(g) is given its intended effect. For example, a district court may enjoin employer and union interference by lock-out or strike with minority efforts to enter previously segregated occupations. See, e.g., United States v. United Brotherhood of Carpenters Local 169, 457 F.2d 210, 220 (7th Cir.), cert. denied, 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972). It may order the establishment of a separate apprenticeship program aimed at fostering minority employment. See, e.g., id. at 216, 220; United States v. Ironworkers Local 86, 443 F.2d 544, 548, 553 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). It may order the admission or hiring of such specific individuals as it finds qualified. See, e.g., Local 53, International Ass'n of Heat & Frost Insulators v. Vogler, 407 F.2d 1047, 1053 (5th Cir. 1969). It may order the development of trade-related membership and hiring criteria, and enforce its order by prohibiting admission of new members or new hires until such criteria are put into effect. See, e.g., id. at 1053. It may order a union or employer actively to disseminate in minority communities information describing training, membership and job opportunities. See, e.g., United States v. Ironworkers Local 86, supra, 443 F.2d at 548. It may require unions and employers to keep and submit extensive records, so that the court while retaining jurisdiction, may accurately evaluate the progress toward compliance. Id. It may forbid the use of non-job-related employment tests having racially disparate impact, and require the application of objective employment standards. See, e.g., Griggs v. Duke Power Co., 401 U.S. 424, 436, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Vulcan Society v. Civil Service Comm'n, 490 F.2d 387 (2d Cir. 1973). And as was done in the present case, it may appoint an administrator to effectuate the various remedial alternatives in an affirmative action program. These are examples of the remedies that Congress had in mind when it used the term 'affirmative action.' It is not necessary to resort to the one means that Congress has specifically denied the courts, preferential hiring.
 
 
 64
 The majority seeks to justify their ordering of racial quotas on the authority of three cases recently decided by this court, cases the principles of which it claims are directly applicable here: United States v. Wood, Wire & Metal Lathers, Local 46, 471 F.2d 408 (2d Cir.), cert. denied, 412 U.S. 939 (1973); Vulcan Society v. Civil Service Comm'n, supra; and Bridgeport Guardians, Inc. v. Civil Service Comm'n, 482 F.2d 1333 (2d Cir. 1973). None of these cases justifies approving the quotas in the present case. Wood, Wire & Metal Lathers arose out of an agreement under which a union settled an action brought by the United States under Title VII. We specifically found that the union had waived the benefit of section 703(j) in the settlement agreement, so that it could not object to the new membership ratio imposed by the court. 471 F.2d at 412-413. In the present case there is no such waiver.
 
 
 65
 Vulcan Society and Bridgeport Guardians stand for no more than the proposition that interim quotas are permissible in actions brought by persons seeking public employment under section 1 of the Civil Rights Act of 1871, 42 U.S.C. 1983 (1970). Neither case was a Title VII action, so in neither case was the district court inhibited by section 703(j). In Vulcan Society and Bridgeport Guardians we approved of only interim hiring quotas pending state development of job-related employment examinations. The fact that public servants were involved was the critical justification for the interim quotas:
 
 
 66
 'Perhaps the most crucial consideration in our view is that this is not a private employer and not simply an exercise in providing minorities with equal opportunity employment. This is a police department and the visibility of the Black patrolman in the community is a decided advantage for all segments of the public at a time when racial divisiveness is plaguing law enforcement.' 482 F.2d at 1341.
 
 
 67
 In the present case racial quotas are not being used to promote a public interest but to allocate private economic benefit.
 
 
 68
 Moreover in Vulcan Society and Bridgeport Guardians there was no other means of affording relief that did not interfere with essential public services. See 490 F.2d at 398. In Vulcan Society, the district court was faced with a choice between enjoining the appointment of new firemen until job-related selection criteria were developed by New York City, or allowing interim recruitment according to a fixed white-minority ratio. We approved the choice of the latter alternative as the lesser of two evils since the former would have seriously jeopardized the safety of city residents.
 
 
 69
 The majority states that 'eight circuits, including our own, have construed (Title VII's) delegation of broad equitable power as authorizing the district court to establish goals or quotas for the purpose of remedying the effects of past discriminatory conduct.' The cases cited by the majority in support of this proposition are neither unqualified nor consistent in their treatment of section 703(j). The variety of approaches manifested in these cases illustrates the overwhelming need to keep the text and legislative history of Section 703(j) firmly in mind when dealing with a case to which it may apply. In any event, a substantial number of the cases cited by the majority do not apply to the present facts. Pennsylvania v. O'Neill, 348 F.Supp. 1084 (E.D.Pa.1972), aff'd in part & vacated in part, 473 F.2d 1029 (3d Cir. 1973) (en banc), and Morrow v. Crisler, 491 F.2d 1053 (5th Cir. 1974), are civil rights actions in the area of public employment. See, e.g., 348 F.Supp. at 1103, 1104. Like Vulcan Society and Bridgeport Guardians they hold only that interim quotas may be employed in a section 1983 action while a local or state government develops jobrelated tests for police force applicants. Associated General Contractors v. Altshuler, 361 F.Supp. 1293 (D.Mass.), aff'd, 490 F.2d 9 (1st Cir. 1973), cert. denied, 42 U.S.L.W. 3593 (April 23, 1974), Contractors Association of Eastern Pa. v. Secretary of Labor, 442 F.2d 159 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971), and Southern Illinois Builders Ass'n v. Ogilvie, 471 F.2d 680 (7th Cir. 1972), each involve racial quotas under Part III of Executive Order 11246, 42 U.S.C.A. 2000e at 281, 284 (1974). United States v. United Brotherhood of Carpenters, Local 169, supra, was an action against unions for improper practices under Title VII in which the court stated that the district court had broad remedial power to effect the purpose of Title VII but in which it stopped short of ordering the unions to accept members according to a fixed racial quota.
 
 
 70
 Of the decisions cited by the majority, only United States v. Ironworkers Local 86, supra, Local 53, International Ass'n of Heat & Frost Insulators v. Vogler, supra; United States v. N.L. Industries, Inc., 479 F.2d 354 (8th Cir. 1973); United States v. Local 212, IBEW, 472 F.2d 634 (6th Cir. 1973), and United States v. IBEW, Local 38, 428 F.2d 144 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970), support the proposition that quotas may be employed in Title VII cases. None of these opinions contains a reasoned discussion of its rationale for not giving effect to section 703(j). These cases disregard section 703(j) and should not be followed by this court.
 
 
 71
 Title VII was enacted by a Congress that wanted to end racism. The racism directed by the district court's employment quotas is completely out of tune with the purpose of Title VII.
 
 
 72
 We have approached racial quotas only 'somewhat gingerly' in the past and approved them only in exceptional cases, cases involving, for example, public employment. See Bridgeport Guardians, supra, 482 F.2d at 1340. Judicial resort to racial classification is designed to make racism respectable. It gives legal sanction to the unfortunate attitudes which have resulted in the exclusion of minorities from the mainstream of the nation's economy.
 
 
 73
 For these reasons, I would modify the district court's order by vacating paragraphs 8 and 9(b)(ii).
 
 
 
 *
 Of the United Sttaes Court of Claims, sitting by designation
 
 
 [1]
 The population statistics are taken from U.S. Department of Commerce, General Social and Econmic Characteristics, 1970 Census of Population-- New York (PC(1)-34N.Y.), Appendix 525, et seq
 
 
 [2]
 Based on Tables from General Social and Economic Characteristics, 1970 Census of Population-- New York (PC(1)-34N.Y.) and excerpts from Table 35, General Population characteristics, 1970 Census of Population-- New York (PC(L)-B34 Exch. U-AV)
 
 
 [3]
 We use 'goal' rather than 'quota' throughout this opinion for the reason that while to some the two words may be synonymous, the term 'quota' implies a permanence not associated with 'goal.' For our purposes the significance of the distinction lies in the fact that once a prescribed goal is achieved the Union will not be obligated to maintain it, provided, of course, the Union does not engage in discriminatory conduct
 
 
 [4]
 In his dissent Judge Hays disputes the force of the earlier decisions of this court. He maintains, for example, that our approval in the Wood, Wire & Metal Lathers case of hiring goals turned solely upon the fact that the union had waived any objection under 703(j) by agreeing to settle the action brought by the Government under Title VII. This court did indeed attach significance to the fact of the settlement, but nonetheless felt obliged to consider the settlement provisions in light of Title VII. We concluded that the goal did not 'do violence to the intent of the Act,' precisely because it was designed to correct past discriminatory practices. 471 F.2d at 413
 My Brother, Judge Hays, is correct in noting that Vulcan Society and Bridgeport Guardians are civil rights cases brought under 1983. But their force is not as easily contained as he would have us believe. Indeed, in Bridgeport Guardians we accepted and relied upon the proposition that Title VII did not prohibit goals aimed at curing past discrimination as support for the use of such goals in a 1983 case.
 
 
 [5]
 Judge Hays' dissent argues that many of these cases do not in fact support the use of quotas against the prohibitions of Title VII. The dissent points, for example, to the fact that the Contractors Association case and the Associated General Contractors case involve quotas prescribed by an Executive Order, not by a Title VII action. But the court in Contractors Association concluded that 'the Executive is bound by the express prohibitions of Title VII' and went on to rule that quotas did not violate the prohibition of 703(a). 442 F.2d at 171-172. Consistent with this approach, the First Circuit in Associated General Contractors cited as support for its holding endorsing the Executive Order those cases that had upheld quotas against challenges under 703(j). 490 F.2d at 16-17, 20-21
 The dissent maintains that the court in Carpenters Local 169 stopped short of ordering fixed racial quotas. Closer inspection reveals the opposite to be the case. In Carpenters Local 169 the Seventh Circuit ordered the district court to fashion a decree directing the defendant unions to issue permits to blacks trained pursuant to the Ogilvie Plan. Elsewhere the Seventh Circuit has upheld against 703(a) and (j) challenge the training provision of the Ogilvie Plan which requires a minimum ratio of 1 trainee (blacks) to 4 journeymen (whites) in the union program. Southern Illinois Builders Ass'n v. Ogilvie, 471 F.2d 680, 684-686 (7 Cir. 1972).
 
 
 [6]
 DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), which involves the constitutionality of preferential law school admissions, is clearly distinguishable, since that case does not involve the use of quotas to eradicate past discrimination. Moreover, unlike the entering class in the law school which had a fixed number of places, the Union does not have a set or maximum number of members
 
 
 [7]
 The full text of 703(j) reads as follows:
 'Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such incividual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.'
 
 
 [8]
 In opening a hearing held on April 26, 1973, with respect to the proposed Order the court stated (Tr. pp. 3-4):
 'The second part of the decree, as I envision it, would be an affirmative action program. I was rather taken by the proposed ordinance in the City of New York and the proposed executive order of the Mayor on this general subject two weeks ago. I rather think that idea will probably be enacted and so that is going to mean, I take it, throughout this industry, whether we do it in this case or not, that the employers and the unions who are in the construction industry are sooner or later going to have to come out with some kind of an affirmative action program, at least if they are going to do city work, and I assume they want to do city work.'
 
 
 [1]
 Since the majority generally refers to the district court's quota as a 'goal,' their opinion may be understood as holding that 'quotas' are permissible under section 703(j), if they are called 'goals.'
 
 
 [2]
 The majority report of the Committee contains only the text of H.R. 7152. All interpretive statements appear as separate reports