Nemesio DOMINGO, Silme Domingo, Joe Ancheta, Sam Cabansag, Tom Carpenter, and all others similarly situated, Plaintiffs,

and

Nellie Kookesh, Audrey A. Merculief, Frank Paul, Mary Paul, Tony Evon, Sr., Samuel Strauss, and all others similarly situated, Plaintiffs-Intervenors,

v.

NEW ENGLAND FISH COMPANY, a corporation, Defendant.

No. 713–73 C2.

United States District Court, W. D. Washington.

Nov. 21, 1977.

Abraham A. Arditi, Michael J. Fox, Antonio R. Salazar, Arditi, Salazar & Goldberg, Seattle, Wash., for plaintiffs Nemesio Domingo, et al.

Philip R. Volland, Alaska Legal Services Corp., Anchorage, Alaska, for plaintiffs-intervenors Nellie Kookesh, et al.

Don Paul Badgley, Michael W. Dundy, Bogle & Gates, Seattle, Wash., for defendant.

## OPINION

SOLOMON, Senior District Judge:

This class action challenges many employment practices of New England Fish Company (Nefco) under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (1970 ed. and Supp. V), and the Civil Rights Act of 1866, 42 U.S.C. § 1981 (1970 ed.).

Plaintiffs are present and former employees of Nefco. They allege that their employer discriminates on the basis of race in jobs, housing, and messing at its Alaska salmon canneries. They seek injunctive relief, back pay for themselves and their class, and also an affirmative program to eradicate the effects of past discrimination.

## I. INTRODUCTION

The charges of discrimination in this action were first asserted in a complaint filed with the Equal Employment Opportunity Commission (EEOC) on November 26, 1971.

Nemesio Domingo is a Filipino. He was employed at Nefco's Uganik cannery in Alaska during the 1969, 1970, and 1971 canning seasons. On several occasions, Domingo objected to unequal treatment of Filipinos and other minority employees. After the 1971 season, Nefco terminated Domingo.

On November 26, 1971, Domingo filed a complaint with the EEOC in which he charged that he was terminated because he was a Filipino and because he had objected to disparate treatment of minority employees. The EEOC deferred his complaint to the Washington State Human Rights Commission pursuant to 42 U.S.C. § 2000e–5(c). The state commission, because of a heavy backlog, was unable to process the complaint, and the EEOC assumed jurisdiction on December 20, 1971.

The EEOC investigated Domingo's charges and found "reasonable cause" to believe that Nefco engaged in discriminatory practices. In December 1974, the EEOC and Nefco reached a conciliation agreement.[1] Domingo was not a party to this

---

1. The agreement provided that Nefco would comply with Title VII in all of its employment practices. Nefco agreed to a goal of 15% minority representation in seven departments: administrative, clerical, machinist, tender, beach gang, carpenter, and culinary. Nefco also agreed to provide substantially similar housing and meals to all employees.

The conciliation agreement is not an admission by Nefco of a violation of Title VII or § 1981. Nor does it necessarily represent the EEOC's interpretation of Title VII. It is a negotiated settlement. The EEOC's interests may not have been the same as plaintiffs' interests here. The conciliation agreement is not entitled to much weight.

agreement. He had already received notice of his right to sue, and he had filed this action on November 29, 1973.

## II. THE COMPANY

### A. *Company Organization*

Nefco operated five salmon canneries and a fleet of tenders in Alaska. The canneries are located at Uganik Bay, Egegik, Chatham, Pederson Point, and Waterfall.

Salmon canning is a seasonal industry. The fishing season in Alaska usually lasts about one month each year, and the fish must be processed shortly after they are caught. A cannery does not operate every year; operations depend on where the fish are running and in what quantities. In a year when a cannery does not operate, it is often staffed with a skeleton crew and used as a camp for fishermen.[2]

Although Nefco's canneries vary in size and in the years they operate, they have the same management structure, job departments, and labor pool. They use the same machinery and processes. All are located in remote areas. Practically all of the employees are migrant workers, and Nefco provides them with housing and eating facilities.

All canning operations are controlled by Nefco's home office in Seattle. A vice president was responsible for all of Nefco's fishing and fish processing operations in Alaska during the years covered by this litigation. A superintendent was in charge of each cannery and reported to the vice president. Because of the remote locations of the canneries, each had some independence in manufacturing, purchasing, and hiring. But, the Seattle office set hiring policies, approved operating budgets, determined some wages, and hired some employees.

### B. *Job Departments*

There are a number of job categories or departments at each cannery. Each department is responsible for a phase of the canning operations.[3]

The administrative department is small. It consists of the superintendent of each cannery who is responsible for the cannery operations. At two of the five canneries, there was also an assistant superintendent.

The clerical department consists of the office workers who handle the cannery's paper work. They include the office manager, storekeeper, and office workers.

The tender department consists of the crews which operate Nefco's fleet of fishing vessels. They spend much of their time at sea. They regularly dock at the cannery to unload fish. At the beginning of each season, the tenders transport supplies and some employees from Seattle to the canneries.

The beach gang unloads fish from the tenders and performs construction and maintenance work at the cannery. This crew is one of the first to arrive at the cannery each season, and it prepares the cannery for the season's work.

The machinists are responsible for operating and maintaining the machines used in the canning process. At the beginning of each season, they tear down, service, and reassemble the machines.

The cannery department consists of the workers who clean, can, cook, and store the fish.

The culinary department prepares and serves meals at the cannery messhalls. They include cooks, bakers and waiters.

The laborer department is responsible for general maintenance. Laborers often assist the beach gangs.

---

**2.** The Uganik cannery did not operate in 1974. Egegik did not operate in 1974, and in 1973 and 1975 it operated only as a fishing camp. Chatham was closed permanently after the 1974 season. Pederson Point has not operated since 1971, except as a fishing camp. Waterfall operated only in 1970; it was sold in 1973.

**3.** The designations of these departments are the ones used by plaintiffs. With a few exceptions, they coincide with Nefco's "job groups".

Carpenters perform the carpentry work at the cannery. Like the beach gang and machinists, they arrive at the cannery before the start of the season to prepare the facility for the season's work.

The quality control department consists of a small number of individuals at each cannery who are charged with the responsibility of checking on the quality of the processed fish. They are directly responsible to the home office.

The miscellaneous department is a catchall for the remaining job categories. The positions include watchmen, nurses, truck drivers, and plumbers.

Within each department there are a number of job titles. The jobs have specific responsibilities, require different skills, and offer different levels of compensation. For example, the tender department includes captains, engineers, and deckhands. Captain is a highly skilled position which requires experience in all aspects of seamanship and navigation. The median wage for the 1975 season was $9,228. The engineer must operate and maintain the tender's engines and other mechanical systems, and he must have some experience at sea. The median wage in 1975 was $6,880. The deckhand job is an entry level position. Some experience with boats and fishing is desirable, but the job requires no specific skills. The median wage for the 1975 season was $3,990.

Because of the seasonal nature of employment at Nefco, there are no formal lines of progression from one job to another within a department or from one department to another. An employee who returns to Nefco for a second season is often hired for a more skilled job with better pay. For example, a person who worked as a deckhand one season might be hired as a mate/deckhand the next season. The mate position requires experience at sea; the median wage for the 1975 season was $4,308.

### C. Hiring

Employment at Nefco's Alaska canneries is seasonal. At the beginning of each season, Nefco hires workers for the canning season. Only a few employees, such as winter watchmen and administrative and clerical personnel, are employed during the off-season. Because the canneries are located in remote areas near the fish runs, the vast majority of Nefco's employees are migrant workers. They come from towns and villages in Alaska and from the lower 48 states.

Hiring responsibilities are delegated to many persons. Ultimate responsibility for staffing the canneries and setting hiring policies rests with Nefco's vice president in charge of Alaska operations. The superintendent of each cannery is responsible for procuring the workers for his operations. Generally, the superintendent hires the foreman of a crew who in turn hires the crew.

Recruitment is informal. Nefco neither advertises job openings nor posts vacancies at the canneries. Much of the recruiting is by word of mouth; relatives of employees and business associates are given preference. There were no written, objective job qualifications to guide the persons making the hiring decision. Nor did Nefco use tests to evaluate applicants. The only employment criteria were: (1) job-related experience; (2) reputation for being a good worker; and (3) compatibility. These criteria were not always adhered to.

### D. Housing and Messing

Nefco provides housing and meals for its employees.

Nefco assigns employees to a particular bunkhouse upon their arrival at the cannery. Because of the remoteness of the canneries, the severity of the weather, and the short canning season, housing at all canneries is Spartan.

Each cannery has at least one messhall. Two of the canneries had a second messhall which served Oriental rather than traditional American food.

## III. THE CLASS

Domingo and five other named plaintiffs [4] brought this action on their own behalf and on behalf of other persons similarly situated. By stipulation of the parties, six Alaska Natives were permitted to intervene as named plaintiffs.

On May 31, 1976, I determined that this action would proceed as a class action, provisionally under Rule 23(b)(2), Fed.R.Civ.P.[5]

The class certified is composed of all non-whites whom Nefco employed at its Chatham, Egegik, Pederson Point, Uganik, and Waterfall canneries at any time until the date of trial.

The parties disagree on the appropriate cut-off date for inclusion of persons within the class for the Title VII claim. Plaintiffs contend that the cut-off date should coincide with the limitation period for recovering backpay and that all non-whites employed by Nefco during the period for which backpay can be recovered should be included within the class. Defendant asserts that the class should include only those persons who could have filed a timely charge with the EEOC when Domingo filed his charges.

A charge of employment discrimination under Title VII must be filed with the EEOC within 180 days of an alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e).[6] If the charge is initially filed with a state agency, the filing period is extended to 300 days after the occurrence of the alleged unlawful practice, or 30 days after receipt of notice that the state agency has terminated its proceedings, whichever is earlier. 42 U.S.C. § 2000e–5(e). Timely filing of a charge with the EEOC is a jurisdictional prerequisite to filing an action in federal court under Title VII. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Pacific Maritime Ass'n v. Quinn*, 491 F.2d 1294, 1295 (9th Cir. 1974).

Not all members of an employee class need file charges with the EEOC to share in the recovery of back pay. A plaintiff who has filed a timely charge with the EEOC may bring a Title VII class action on behalf of class members who have not filed charges. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 n.8, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The purposes of the filing requirement—to give notice to the charged party and enable the EEOC to conciliate—are adequately served by a timely filing by any member of the class. *Laffey v. Northwest Airlines*, 567 F.Supp. 429 (D.C. Cir.1976); *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 720 (7th Cir. 1969).

Whether a named plaintiff can represent persons who were time barred from

---

4. The six original plaintiffs were Nemesio Domingo, Silme Domingo, Joe Ancheta, Sam Cabansag, Michael Cervantes, and Tom Carpenter. There were two defendants: New England Fish Company and Nefco Fidalgo Packing Company. Nefco Fidalgo was dismissed as a defendant in this action for lack of jurisdiction because it was not named in the complaint filed with the EEOC. Subsequently, Michael Cervantes moved for a voluntary dismissal because he had no claim against Nefco, the remaining defendant. Tom Carpenter was not employed by Nefco and is not a member of the class. He has a claim against Nefco arising from a rejected application for employment.

5. I reserved ruling on whether certification under Rule 23(b)(3) might be appropriate at some later date.

6. Title 42 U.S.C. § 2000e–5(e) provides:
 "A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency."

filing a charge with the EEOC at the time the named plaintiff filed charges is a separate question. In my view, only those employees who could have filed charges with the EEOC individually when the named plaintiff filed charges are properly members of the litigating class. *See, e. g., Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 246 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Laffey v. Northwest Airlines, supra*, at 476.

I hold that only employees not time barred from filing a charge with the EEOC when Domingo filed his are to be included in the class for the Title VII claims.

The parties also disagree on the proper cut-off date for filing charges with the EEOC. What is the significance of the EEOC's deferral of Domingo's charge to the state agency and of the 1972 amendment of Title VII?

Although Domingo first filed his charges with the EEOC, the state agency, pursuant to 42 U.S.C. § 2000e–5(c), was afforded the first opportunity to act on the complaint.

■ When a state agency has had the first opportunity to act on a complaint, the filing period for charges initially filed with a state agency is the appropriate one. *See Love v. Pullman Co.*, 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972); *Ugiansky v. Flynn and Emrich Co.*, 337 F.Supp. 807, 808–09 n.4 (D.Md.1972).

■ In 1971, a person had 210 days after the occurrence to file charges with the EEOC if he first filed charges with a state agency. While Domingo's charge was pending with the EEOC, the Civil Rights Act of 1964 was amended by the Equal Employment Opportunity Act of 1972, Pub. L.No.92–261, § 4(a), 86 Stat. 103, to extend the filing period from 210 to 300 days. Sec-

tion 14 of the Equal Employment Opportunity Act made the amendments applicable to all cases pending before the EEOC on the date of enactment.[7] I hold that the appropriate period to be applied here is 300 days.

The class, therefore, is composed of all non-whites whom Nefco employed at its Chatham, Egegik, Pederson Point, Uganik, or Waterfall facilities during the period from January 30, 1971 (300 days before the date on which Domingo filed his charges) to November 8, 1976 (the date of trial).

## IV. JOBS

Plaintiffs contend that Nefco discriminates on the basis of race in initial job assignments and promotions. Specifically, plaintiffs contend that Nefco relegates non-whites to the less desirable, lower-paying jobs and fails to promote them to more desirable, better-paying jobs.

### A. *Statistics*

■ To establish a violation of Title VII[8] one need not prove a subjective intent to discriminate. "Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). The inquiry must therefore be directed to the impact, rather than the intent, of an allegedly discriminatory hiring practice or criterion.

■ The crux of statistical proof in discrimination cases is the presentation of percentage differences sufficiently substantial to suggest bias. On such a showing, courts may proceed as though discrimination explains the observed conditions even in the absence of direct evidence. *See* Note, "Be-

---

7. Section 14 of the Equal Employment Opportunity Act of 1972 provides:

"The amendments made by this Act to Section 706 of the Civil Rights Act of 1964 shall be applicable with respect to charges pending with the Commission on the date of enactment of this Act and all charges filed thereafter."

8. Plaintiffs bring this action under both Title VII and § 1981. Although Title VII and § 1981 are not co-extensive, *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), the substantive law on the issue of liability, as it applies here, is essentially the same. The § 1981 claims will not be discussed separately except where they present issues different from Title VII.

yond the Prima Facie Case in Employment Discrimination Law: Statistical Proof and Rebuttal", 89 Harv.L.Rev. 387, 391–93 (1975).

### 1. *Comparative Statistics*

▮ Plaintiffs presented statistics on the racial composition of Nefco's work force. A comparison of the number of whites and non-whites in job departments and positions may indicate whether there is job segregation at Nefco.

Table A shows employment in Nefco's job departments by race for the years 1970–75.[9] The number of white and non-white employees over the five-year period was almost equal. Whites constituted 53% of Nefco's work force, and non-whites were 47%. However, four departments had 90% or more whites, and one department had more than 75% non-whites.

Table B is a more detailed breakdown of the job departments into job titles. From 1970–75, 49 of Nefco's 99 job titles were either 90% or more white or 90% or more non-white.[10] In fact, 44% of all Nefco hires were in these job titles.

In some departments, the racial concentration was even more pronounced than the tables indicate. For example, the beach gang department, which appears partially integrated company wide in Tables A and B, was almost completely white at two canneries. From 1970–75, it was 100% white at Egegik; from 1970–73, it was 93% white at Pederson Point.

The statistics in Tables A and B show that Nefco's job departments are segregated by race. Non-white employees are concentrated in some departments, and white employees are concentrated in others. Eight departments are predominantly white: administrative, clerical, tender, machinist, quality control, beach gang, culinary, and miscellaneous. One department is predominantly non-white: cannery. Only two departments reflect the relative number of white and non-white employees: carpenter and laborer. Furthermore, in some job departments the non-whites were concentrated in the lower-paying jobs. Whites held 74% of the jobs in the beach gang department, and they held 95% of the beach boss jobs.

Plaintiffs contend that the more desirable jobs are in the predominantly white departments. Most of the jobs in the administrative, clerical, tender, machinist and quality control departments pay substantially more than the jobs in the cannery department, or even the laborer department. Among seasonal jobs, only machinist, tender, beach gang, and Alaska Fishermen's Union (AFU) culinary jobs have a pension plan. There is greater job security in some of these jobs, because even in seasons when a cannery does not operate, often an office staff, port engineer, beach gang, AFU culinary staff, and sometimes machinists are employed. Although these jobs may be more attractive to some employees, other employees may not necessarily prefer jobs in the predominantly white departments. However, "Title VII provides for equal opportunity to compete for *any* job, whether it is thought better or worse than another." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 338, 97 S.Ct. 1843, 1855 n. 18, 52 L.Ed.2d 396 (1977).

**9.** In Tables A–C, each job title was counted once for each year it existed. In some cases, a single individual held a job for more than one year and is counted more than once. In my view, this method is sound. With few exceptions, the jobs are seasonal and a person must be rehired each year. The statistics represent hires rather than individual employees. Although this might cause some distortion in the hiring picture, any distortion would be small because the return rate for whites and non-whites was almost the same:

Return Rate of Nefco Employees
1970–6

| | W | NW | % W | % NW |
|---|---|---|---|---|
| Worked only one year | 729 | 592 | 69% | 64% |
| Worked two years | 178 | 191 | 17 | 21 |
| Worked three years | 80 | 72 | 8 | 8 |
| Worked four years | 37 | 30 | 4 | 3 |
| Worked five years | 24 | 36 | 2 | 4 |
| Worked six years | 6 | 9 | 1 | 1 |
| Individuals hired | 1054 | 930 | 100 | 100 |

Total hires: 1629 – White
1544 – Non-white

**10.** This figure excludes the four job titles Nefco filled only once between 1970–75.

Plaintiffs' statistics are buttressed by company records which label work crews by race. Time sheets have job titles such as "Fil.[ipino] Crew—1st Foreman", "Fil. Crew—Inspector", "Native Cannery Foreman", "White Bull Cook", "Fil. Crew—Butcher". Computer ledgers at Nefco's home office, internal memoranda, and budget forms prepared by cannery superintendents contain similar entries.

Plaintiffs also contend that white employees receive a disproportionate number of promotions to the higher-paying jobs. They present statistics which compare transfers of Nefco employees across department lines by race from 1970–75. Table C–1.[11] Almost without exception, the employee transferred to a higher-paying job; the transfer therefore represented a promotion, even though Nefco has no formal lines of promotion.

Plaintiffs' statistics record only transfers to job titles within five predominantly white departments: administrative, clerical, tender, machinist, and quality control. These statistics are substantially accurate in the limited picture they portray. The number of promotions is relatively small. Of those which plaintiffs record, white employees accounted for 93%.

Nefco presents additional statistics which show transfers of minorities across department lines. Table C–2. They show transfers to jobs in departments other than the five plaintiffs examined. They do not show how many whites were transferred to these departments, making it impossible to determine the percentage of transfers non-whites received as compared to whites.

The promotion statistics are incomplete, and the number of promotions recorded are small. Nevertheless, the statistics present a definite picture. White employees receive a substantially greater percentage of the

transfers to jobs within the higher-paying jobs in the predominantly white departments. Nefco's statistics support plaintiffs' statistics. Non-whites were transferred, but not to the higher-paying jobs in the predominantly white departments.

I find that the statistics submitted by both plaintiffs and defendant are substantially accurate, and when they refer to the same areas, ordinarily they support each other.[12]

Nefco further contends that comparative employment statistics at its canneries are insufficient to establish a prima facie case of discrimination and that discrimination can only be shown by demographic statistics comparing an employer's work force with the labor pool in the appropriate geographic area.

I disagree. Comparative statistics are often used to show stratification of jobs within an employer's work force as evidence of discrimination. *See, e. g., International Brotherhood of Teamsters v. United States, supra,* 97 S.Ct. at 1855–58, 1858 n. 23; *James v. Stockham Valves and Fittings Co.,* 559 F.2d 310 (5th Cir. 1977); *Wetzel v. Liberty Mutual Ins. Co., supra,* at 257–58; *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 223–36 (5th Cir. 1974); *Brown v. Gaston County Dyeing Machine Co.,* 457 F.2d 1377, 1380–83 (4th Cir.), *cert. denied,* 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972); *United States v. Jacksonville Terminal Co.,* 451 F.2d 418, 441–43 (5th Cir. 1971), *cert. denied,* 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); *Jones v. Lee Way Motor Freight, Inc.,* 431 F.2d 245, 246–47 (10th Cir. 1970), *cert. denied,* 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971). Comparative statistics may be more relevant than demographic statistics in some cases. *See* Note, "Employment Discrimination: Statistics and Preferences Under Title VII," 59 Va.L.Rev. 463, 468–70 (1973).

11. The figures represent transfers, not necessarily the number of individuals. In some instances, the transfer was within a season; in others, an employee was hired for a second year in a different job.

12. The only significant difference between plaintiffs' statistics and defendant's statistics concerns the number of persons hired in the tender and culinary departments. The disparity does not substantially affect the ratio of white to non-white employees.

Nefco contends that this is a "hiring case", not a "promotion case". It asserts that there are no lines of progression and that transfers should not be regarded as promotions. In my view, this case cannot be characterized as only a "hiring" or a "promotion" case. It is an employment discrimination case in which Nefco's employment practices are challenged. Whether an employee's transfer from one job to another is regarded as a promotion or a new hire is insignificant. The question is whether Nefco's practices and procedures discriminate against non-whites, and the statistics are evidence bearing on this issue.

## 2. Demographic Statistics

Under the demographic method, statistics are used to determine whether there is a disparity between a minority group's representation in an employer's work force and that group's representation in the relevant labor market. Demonstration of a percentage disparity between a minority group's representation in a particular position under scrutiny and the group's representation in the relevant labor market available to the employer is evidence of discrimination under Title VII. *See Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 425, 95 S.Ct. 2362; 89 Harv.L.Rev. 387, *supra,* at 391.

The determination of the relevant labor market is crucial to the demographic method. Courts have often defined the market in geographic terms, taking the population of the community surrounding the defendant's business, or some portion of it, as the labor market from which the defendant was most likely to attract employees. *See, e. g.,*

*Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *United States v. Hayes International Corp.,* 456 F.2d 112 (5th Cir. 1972); *United States v. Ironworkers Local 86,* 443 F.2d 544 (9th Cir.), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); *Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421 (8th Cir. 1970). But defining the relevant labor market is a question of fact, and courts have not adhered rigidly to one formula. Rather, courts have been flexible in their use of demographic statistics and have sought the statistics which best define the relevant labor market under the facts of the particular case.[13] Courts have rejected hiring area statistics altogether when there has been a better measure of non-white availability.[14]

Here the parties disagree on the applicable labor market. The canneries are located in remote, sparsely populated areas, and there is an insufficient local·labor supply within commuting distance of the canneries. Nefco's work force is almost entirely migrant; employees come from 29 states. The relevant labor market cannot be defined in terms of the population near the canneries.

Plaintiffs contend that the relevant labor market consists of those persons who are willing to take migrant, seasonal work in the Alaska salmon canning industry. They assert that a study of those who worked in the industry in the past will most accurately measure this market. Two government agencies compiled employment statistics for the Alaska salmon industry over a period of fifty years.[15] Based on these statistics,

---

**13.** One court adjusted hiring area statistics for age, sex, race, and education in order to determine the percentage of non-whites available for work as steamfitters as precisely as possible. *Rios v. Enterprise Ass'n Steamfitters,* 501 F.2d 622, 632–33 (2d Cir. 1974), *on remand,* 400 F.Supp. 983 (S.D.N.Y.1975). Another selected a portion of the hiring area, noting that employees would most likely be drawn from that area. *United States v. Ironworkers Local 86, supra,* at 551 n. 19.

**14.** Some courts have ignored hiring area statistics in favor of applicant figures. *See, e. g.,*

*Hill v. Western Electric Co.,* 12 FEP Cases 1175 (E.D.Va.1976); *Hester v. Southern Railway Co.,* 497 F.2d 1374 (5th Cir. 1974).

**15.** The U. S. Bureau of Fisheries compiled statistics on the race of workers in the Alaska salmon canning industry from 1906 to 1939. The U. S. Marine Fish and Wildlife Service compiled comparable statistics from 1941 to 1955. The statistics during 1948–55 were for the entire Alaska salmon industry (canned, fresh, frozen, and cured) rather than just the canning portion. The statistical series was discontinued in 1955.

plaintiffs conclude that the industry labor supply is 50% non-white.[16]

Most of Nefco's employees from 1970–75 came from three states: Alaska, Washington and California.

Nefco asserts that the relevant labor market is the population in the areas where the employer hires its employees. Nefco defines its geographic hiring area, not as the area surrounding the canneries, but as the areas from which Nefco actually draws its employees. Using census data, Nefco devised two demographic standards: one for its general labor force and one for several specific job departments.

Nefco calculated the demographic hiring standard for its general labor force by weighing the percentage of non-whites in Alaska, Washington and California in proportion to the percentage of Nefco's employees that came from those states. Nefco concluded that 15% of the relevant labor market was non-white.[17]

Nefco asserts that in four of its job departments the relevant labor market must be more narrowly defined to reflect a more limited geographic hiring area and special skill requirements. First, Nefco contends that only the demographic statistics for Washington should be used in determining the percentage of non-whites in the market for jobs in the administrative, clerical, tender and machinist departments because most of the employees in these jobs are Washington residents.[18] Second, Nefco asserts that Washington census figures for "managers and administrators" and for "craftsmen" should be used in defining the labor market for some job categories to reflect skills required for the jobs. Nefco contends that demographic statistics for "managers and administrators" should be used for the superintendent, assistant superintendent, office manager, assistant office manager, and cannery foreman jobs; and demographic statistics for "craftsmen" should be used for the machinist (except helper and trainee), cannery foreman, tender captain, and tender engineer jobs. Using this approach, Nefco concludes that the following are the appropriate demographic statistics:

| Job | Qualified Minorities in Hiring Area (%) |
|---|---|
| Superintendent, asst. super-intendent office manager, asst. office manager, cannery foreman | 2.3% |
| Machinist (except helper, trainee, or cannery fore-man) | 4.0 |
| Tender captain and engineer | 4.0 |
| Tender (except captain and engineer) | 5.5 |
| Machinist helper and trainee | 5.5 |
| All other jobs | 15.0 |

The great disparity between plaintiffs' and defendant's statistics illustrates the problem of determining the racial composition of the relevant labor market. Logically, the relevant labor market consists of those persons who are both competent and

16. From 1906 to 1922 non-whites comprised 65–70% of the persons employed in the Alaska salmon canning industry. By 1926 the percentage of non-whites leveled off at approximately 50% and remained at that percentage until 1955. Nefco's employees were 47% non-white from 1970 to 1975.

17. Nefco's computations are:

| | Nefco employees residing in state (%) | | Non-white population of state (%) | |
|---|---|---|---|---|
| Washington | 52% | x | 7.7% | = 400.4 |
| Alaska | 29 | x | 23.3 | = 675.7 |
| California | 12 | x | 26.5 | = 318.0 |
| | 93% | | | 1,394.1 |

$$\frac{1,394.1}{93} = 14.8\%$$

18. For tender jobs, Nefco contends it hires tender crews in Seattle because the vessels are docked there during the winter. But non-whites pay their way to Seattle to take jobs which pay substantially less than tender jobs. They probably would do the same for tender jobs. In addition, for those vessels which wintered in Alaska, tender crews were flown to Alaska from Seattle. There is no reason why Nefco could not have hired crews in Alaska to staff those tenders.

willing to take seasonal work in Alaska. But defining the market is of little use if such statistics are not available. I am not aware of a case in which a court considered the problem of finding a relevant labor market where the employees were migrant and seasonal workers. Neither plaintiffs' nor defendant's statistics on the relevant labor market are in point.

The cases on which Nefco relies to support its methodology are fixed-employment cases in which the courts used demographic statistics for the area surrounding the employer's place of business to measure the racial composition of the labor market. Only a tiny fraction of the people who live in what Nefco defines as its hiring area are willing to take seasonal, migrant employment. Most people prefer the security of year-round employment and seek jobs near their homes. Nefco's demographic statistics are too broad.

There is even a more fundamental flaw in Nefco's statistics. Nefco's statistics incorporate the practice of hiring through separate channels for different jobs. Nefco offers not one labor market but several, each defined by the area from which Nefco chooses to hire employees for a particular job.[19]

Nefco purports to be following a line of cases which have used the employer's hiring areas to define the relevant labor market.[20] In these cases it was presumed that the vast majority of those persons willing to accept employment lived within a specified commuting distance of the employer's place of business. Therefore, a geographic area near the place of business was used to define the relevant labor market. Nefco focuses on the means rather than the end and contends that the labor market can only be defined in terms of the geographic area where the employer hires its employ-

ees. This limitation is improper, especially where, as here, the employer seeks to use the areas it chooses to find employees instead of the area surrounding its place of business. The area where Nefco chooses not to hire its employees is as relevant as the areas where it does hire. Under Title VII, an employer must take its labor market as it finds it. Courts must be flexible in defining the relevant labor market.

Plaintiffs' labor market is based on statistics dating back to 1906 and ending in 1955. They show that about half of the employees in the Alaska salmon industry were non-white. Plaintiffs assume that the industry hired persons in the same percentage as their availability in the labor market. There is no persuasive evidence warranting that assumption. Institutional restraints in the labor market could have distorted the racial composition of the employed labor force. Labor unions are one such restraint. For example, Local 37, International Longshoremen's and Warehousemen's Union (I.L.W.U.), which dispatches non-resident cannery workers to Nefco, is almost entirely Filipino, and the persons it dispatched were Filipinos.

■ Although I find that plaintiffs' historical statistics may be unreliable in establishing the racial composition of Nefco's labor market from 1970–75, they do have some relevance to plaintiffs' statistics on job segregation within Nefco's own labor force. If the Alaska salmon industry has hired approximately 50% non-whites over a period of more than fifty years, it may be significant that more non-whites are not found in administrative, clerical, tender, machinist, and other departments.

■ Statistics are merely evidence of discrimination, and their probative value varies with the circumstances of each case. *See United States v. International Brother-*

---

19. This type of selectivity could be used to justify a company's having only white executives by showing its executives live in all-white suburbs and by defining the relevant labor market as the population in those suburbs.

20. *See, e. g., Gibson v. Local 40, Supercargoes and Checkers,* 543 F.2d 1259 (9th Cir. 1976); *United States v. Elevator Constructors, Local 5,* 538 F.2d 1012 (3d Cir. 1976); *Brown v. Gaston County Dyeing Machine Co., supra; United States v. Hayes International Corp., supra; United States v. Ironworkers Local 86, supra.*

*hood of Teamsters, supra*, 97 S.Ct. at 1856–57; *United States v. Ironworkers Local 86, supra*, at 551. Where, as here, the work force is migrant and seasonal, and the demographic statistics have little probative value, comparative statistics have critical, if not decisive, significance, at least in placing the burden of explaining the apparent disparity on the employer.

### B. *Employment Practices*

■ Title VII prohibits employment practices which are neutral on their face but which have a discriminatory effect and cannot be justified by business necessity. *Griggs v. Duke Power Co., supra*, 401 U.S. at 430–32, 91 S.Ct. 849.

Plaintiffs challenge several of Nefco's hiring practices which they contend are neutral on their face but operate as barriers to non-whites.

### 1. *Separate Hiring Channels*

Nefco hires employees for each job department through separate channels.

Nefco hires most cannery workers through two channels: recruitment in Alaska villages and dispatches from Local 37, I.L.W.U., in Seattle. Almost all of the Alaska recruits are Alaska Natives, and almost all of the Local 37 dispatches are Filipinos. In addition, Nefco hires a small number of cannery workers each year directly through its Seattle office. Almost all of these direct hires are white; many are college students.

The procedure for hiring cannery workers is essentially the same for each cannery. Before each season, the superintendent hires a cannery worker foreman, known as the "native foreman".[21] The superintendent informs the foreman when the cannery will commence operations and how many cannery workers are needed. The foreman then recruits these workers from native villages in Alaska. These workers are known as the "native crew".[22]

Cannery workers who do not live in Alaska are called "non-resident" cannery workers. They work under the jurisdiction of Local 37. Fifteen days before departure for the cannery each year, Nefco must inform Local 37 how many non-resident cannery workers it has hired directly and how many additional workers it will need. The union then dispatches the appropriate number of workers. In the collective bargaining agreement with the union, there are preference provisions for the rehire of persons previously employed by Nefco.

Nefco's Seattle shipyard manager or the cannery superintendents hire the tender captains and engineers. The more experienced captains then hire their own crews, subject to the approval of the shipyard manager or the superintendent. Captains often hire their relatives and friends as crew members. Nefco witnesses stressed that compatibility in close working and living conditions is required for a job on a tender. The Alaska Fishermen's Union, which represents Nefco tendermen, has no formal role in hiring, and there are no rehire preferences.

The cannery superintendent hires a cannery foreman, who in turn hires the machinists. Recruitment is by word of mouth or by referrals from the unions. The machinists work under the jurisdiction of local machinist unions, but the unions have no formal role in hiring, even though collective bargaining agreements contain rehire preference provisions.

Nefco hires the beach gangs in a manner similar to machinists. Beach bosses are usually hired by the superintendent, and they in turn hire the beachmen. Recruitment is by word of mouth.

Nefco's Director of Food Technology and Quality Assurance hires quality control workers. He recruits students from the food science programs at Oregon State Uni-

---

**21.** At Chatham and Waterfall a union delegate rather than a cannery foreman recruited workers.

**22.** At Egegik, the foreman recruited workers in three villages: Bethel, Kwigillingok, and Kongiganak. Bethel is 90% non-white; Kuskokwim, where Kongiganak and Kwigillingok are located, is 75% non-white.

versity and the University of Washington. To maintain the independence of quality control from the cannery operations, hiring is independent of the cannery superintendents.

Nefco hires administrative personnel (cannery superintendents and their assistants) through the Seattle office. Generally persons in these positions are transferred from other Nefco operations or were employed by companies purchased by Nefco.[23]

Hiring responsibilities for the clerical, culinary, laborer, carpenter, and miscellaneous departments appear to have no specific pattern. The cannery superintendents hire many of these employees. Sometimes hiring responsibilities are delegated. The superintendent hires the office manager, who hires seasonal office workers. A steward or first cook often hires waiters.

Nefco's use of separate channels in hiring for particular jobs produced predictable results. By recruiting cannery workers in native villages in Alaska and hiring Local 37 dispatches, Nefco secured a cannery work force that was almost entirely Alaska Native and Filipino. Nefco neither recruited in Alaska villages, nor relied on union dispatches for the other departments.

For other departments, Nefco relied on informal word-of-mouth recruitment. Almost without exception, the superintendents, foremen, and captains who did the recruiting were white; and the employees they recruited were white.[24]

### 2. *Word-of-Mouth Recruitment*

Nefco does not advertise job openings or post vacancies. Most positions are filled by word-of-mouth recruitment. Employees tell friends and relatives about job openings. And Nefco foremen have sometimes asked unions for referrals even though the

unions had no formal role in hiring. Chatham's cannery foreman explained how he recruited machinists: "My friends are machinists, and if they can do the job, I ask . . . . [the cannery superintendent] to interview them."

Under word-of-mouth hiring friends and relatives of employees in a particular department receive first word about job openings. This tends to isolate non-whites from the "web of information" about job opportunities in the predominantly white departments. *See United States v. Georgia Power Co.*, 474 F.2d 906, 925 (5th Cir. 1973). This isolation is aggravated by the housing and messing segregation at the canneries.

### 3. *Nepotism*

Nefco gives preference in hiring to relatives of company employees and business associates.

Nefco's vice president in charge of Alaska operations stated in a January 8, 1970, memorandum circulated to cannery superintendents:

> "In keeping with our previous policy, we are generally obligated to hire a number of college students that are either employee's sons or sons of close business associates. Please let me know how many openings can be filled with this class of people; i. e., waiters, tally men, oil men, etc."

Until 1974, Nefco inquired on its employment application form whether the applicant had relatives employed by Nefco.

The policy is pervasive. Every cannery superintendent, except the one at Chatham, hired his wife in the clerical department; the Chatham superintendent hired his daughter. Tender captains hired relatives as crew members. The cannery foremen

---

**23.** During the years in question, eight persons held the position of cannery superintendent. Four were superintendents at canneries purchased by Nefco and continued in their positions under Nefco. A fifth was a Nefco superintendent since 1961, well before the years in question here. Two persons held the position of assistant superintendent; both were later promoted to superintendent.

**24.** For example, from 1970–75, 92% of Nefco's tender captains were white, and 96% of the crews were white. In the machinist department, 100% of the cannery foremen were white, and 90% of the machinists were white.

hired relatives of machinists as machinist helpers and trainees.

 Although Title VII does not prohibit nepotism as such, it prohibits nepotism when it results in discrimination. *Gibson v. Local 40, Supercargoes and Checkers,* 543 F.2d 1259, 1268 (9th Cir. 1976).

Nepotism helped both whites and non-whites obtain employment. But when whites controlled the best jobs, the policy of nepotism favored the whites. Plaintiffs catalogued 139 instances in which white relatives of Nefco employees were hired from 1970–73. Sixty-four were in the five most predominantly white departments. Nefco found only nine instances in which a relative of a non-white employee was hired in one of these predominantly white departments. Whites, therefore, received 88% of hires based on nepotism in these departments.

### 4. *Employment Criteria*

Nefco has neither formal selection standards nor written guidelines for hiring or transferring employees. Each decision was made by a cannery superintendent or a foreman on the basis of his subjective judgment. Almost without exception the persons responsible for hiring were white. There were no safeguards against racial bias in the selection process.

 Hiring and transferring procedures which depend almost entirely on the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination. *Rowe v. General Motors Corp.,* 457 F.2d 348, 359 (5th Cir. 1972). Courts have condemned procedures for promotion and job assignment which are not objective and uniform. *E. g., James v. Stockham Valves and Fittings Co., supra,* at 330; *Pettway v. American Cast Iron Pipe Co., supra,* at 231–32; *Brown v. Gaston County Dyeing Machine Co., supra,* at 1382.

Here, absent objective criteria applied to all workers, the statistics indicate that race is the only identifiable factor explaining the disparity between the jobs held by white employees and those held by non-white employees.

### C. *Burden of Proof*

 The plaintiff in an action under Title VII has the burden of establishing a prima facie case of employment discrimination. *Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 425, 95 S.Ct. 2362. That burden may be met with statistical proof when it reaches proportions comparable to those in this case. *See International Brotherhood of Teamsters v. United States, supra,* 97 S.Ct. at 1856; *James v. Stockham Valves and Fittings Co., supra,* at 319–29; *United States v. Ironworkers Local 86, supra,* at 550–51.

 Here the plaintiffs have produced evidence of gross disparities on the basis of race in job allocations at Nefco. Statistics reveal that all but two job departments are predominantly white or non-white. White employees are concentrated in the higher-paying jobs. Statistics also reveal that whites receive the vast majority of promotions to the higher-paying jobs.

Plaintiffs have buttressed their statistical evidence with evidence of employment practices which have a discriminatory impact on non-whites. Plaintiffs also produced testimony of individuals who recounted specific instances of discrimination.

I find that plaintiffs have made a prima facie case of discriminatory employment practices in job allocations at Nefco.

 Once the plaintiff in a Title VII case has presented a prima facie case of discrimination, the defendant has the burden of going forward with the evidence and the burden of persuasion. *Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 425, 95 S.Ct. 2362; *United States v. Ironworkers Local 86, supra,* at 551.

### D. *Nefco's Rebuttal*

Nefco attempts to rebut the inference of discrimination by several arguments.

First, Nefco challenges the accuracy of plaintiffs' statistics. It asserts there is no

statistical evidence of racial stratification in its job departments, and therefore there is no evidence that its hiring practices have a discriminatory effect on non-whites.

I found that plaintiffs' comparative employment statistics are substantially accurate. They reveal segregation by race in Nefco's jobs. The separate hiring channels, word-of-mouth recruitment, and nepotism severely limited employment opportunities for non-whites and were largely responsible for job segregation.

Second, Nefco asserts that any racial disparity in its job departments is the result of lack of requisite skills and experience among non-whites to perform certain jobs in the administrative, clerical, tender, and machinist departments.

■ Once plaintiffs' statistical proof has created an inference of discrimination, it is defendant's burden to show there was a lack of qualified non-whites to fill the jobs. *Kaplan v. Theatrical and Stage Employees,* 525 F.2d 1354, 1358 n. 1 (9th Cir. 1975); *United States v. Hayes International Corp.,* supra, at 120.

■ Nefco introduced written job descriptions which, it asserts, describe the necessary qualifications for and realistic descriptions of the work performed in some jobs.[25] Nefco's expert witness who prepared the descriptions testified that some of the positions required craftsmen [26] and others required managers and administrators [27] as those terms are defined by the United States Bureau of Census. From census data, he calculated the number of non-white craftsmen, managers, and administrators in the state of Washington, and he concluded that few non-whites possessed the skills required for these jobs.

The job descriptions were prepared for this litigation. Nefco had neither written nor unwritten objective job qualifications during the years in question. The job descriptions present ideal qualification; Nefco hired on lower standards. If Nefco had demanded that persons actually hired meet the qualifications in the job descriptions, it would not have hired many of its employees.

For example, a stated requirement of the can shop machinist job is

". . . prior experience of sufficient time and depth to have demonstrated thorough competency in identical or closely similar job involving adjusting, timing, operating, repair and maintenance of machines with similar operating components and characteristics with such degree of competency expected to be gained and proved typically in not less than three years' prior experience."

Nefco hired Ernest Suit to be a can shop machinist and operate a reform machine. He had never seen a reform machine, and he had never worked as a machinist. He learned to operate the reform machine by talking with his brother, who was a cannery foreman at another Nefco facility, and by reading a manufacturer's brochure. Most of his experience consisted of tuning automobile engines. He worked several years in canneries operating machines, but his experience was confined to turning a machine on and watching it operate.

According to the job description, the tender engineer position requires a "thorough understanding of regular and preventive maintenance procedures and operating procedures for marine diesel engines," and "experience in major overhaul of diesel engines". Nefco hired Robert Allen as a tender engineer. He had no experience with marine engines; his experience consisted of working with engines on a farm where he grew up and of watching a tender engineer at work during a season and a half as mate on a tender. Allen was the son-in-law of a cannery superintendent.

---

**25.** The job descriptions cover 13 jobs, all of which are in the administrative, clerical, tender, and machinist departments except one, cannery worker.

**26.** First machinist, iron chink machinist, filler machinist, can shop machinist, seamer machin-

ist, salmon cook/fireman, port engineer, tender captain, tender engineer.

**27.** Cannery superintendent, office manager, cannery foreman.

438

Nefco asserts that its job descriptions are the standards by which non-whites must be measured to determine whether they are qualified for the jobs. But the descriptions describe neither hiring criteria actually used by Nefco nor the skills actually needed to perform the jobs. Non-whites must be measured by the same criteria that were applied to whites.

The evidence shows that in practice Nefco looked for persons who had some job-related experience, who had a reputation for being a good worker, and who would be compatible with other workers. These subjective criteria were weighed by the cannery superintendents and foremen charged with the responsibility of hiring. Nefco asserts that in applying these criteria it sought the "best qualified" person available.

Plaintiffs admit that skills are necessary for some jobs, but they deny that Nefco has shown that it had or used a standard of efficiency or expertise that was required to perform these jobs efficiently. I agree. Nefco has failed to show what qualifications actually are needed to perform the skilled jobs. And in light of Nefco's actual hiring practices—word-of-mouth recruitment, nepotism, separate hiring channels, and lack of objective hiring criteria—its contention that it hired the best qualified person is not credible. Nefco's subjective criteria and affirmations that it hired the best qualified person available are insufficient to dispel plaintiffs' prima facie case.

For entry level jobs, Nefco's hiring record is equally deficient. Nefco concedes that the machinist helper and trainee positions require no special skills. Nevertheless, 90% of these jobs were given to whites. In the tender department, the positions of mate, deckhand, and tallyman require no particular skills. Yet 98% of these positions were given to whites. Nefco, by this practice, deprived non-whites of the opportunity to acquire the skills and experience needed for the skilled machinist and tender jobs.

Finally, Nefco contends that even if there were qualified non-whites available, very few expressed an interest in or applied for a job in the predominantly white departments. Nefco actively recruited applicants for these higher-paying jobs and gave the jobs to relatives and friends of its employees and business associates, almost all of whom were white. In spite of such employment practices, and of its policy of discouraging non-whites from attempting to obtain such positions, Nefco now says that the failure of non-whites to apply for these jobs indicates that they were uninterested in them. There is no merit in this contention. *See International Brotherhood of Teamsters v. United States, supra,* 97 S.Ct. at 1843; *James v. Stockham Valves and Fittings Co., supra,* at 341–42.

I find that Nefco has failed to rebut plaintiffs' prima facie case of discriminatory employment practices in job allocation.

## V. HOUSING AND MESSING

Nefco houses and feeds it employees at the cannery sites as part of their compensation.[28] Plaintiffs contend that Nefco segregates its bunkhouses and messhalls by race and that non-white employees receive inferior accommodations and food.

### A. *Housing*

Nefco assigns each employee to a particular bunkhouse. It asserts that housing assignments are based not on race but on crew and date of arrival at the cannery.

The machinist, beach gang, and carpenter crews generally arrive at the cannery in April or May, a month or more before the start of the canning season. They prepare the cannery facilities and machinery for the approaching canning season. These crews are generally housed together in the bunkhouses which afford the best protection from the weather. As other crews arrive at

---

**28.** Nefco is obliged to provide housing and meals to its employees under its collective bargaining agreements. Some Alaska Natives do not receive company meals. Instead, they re-ceive a higher hourly wage than their co-workers and can purchase food at the cannery store at reduced rates.

the cannery, they are assigned to the remaining bunkhouses. The cannery crew is generally the last to arrive.

Table D, which is based on a stipulation of the parties, represents housing assignments at Nefco's five Alaska salmon canneries during the years 1970–75.[29] These statistics show a pattern of segregation. Nefco houses its employees in bunkhouses which are either entirely or largely segregated.

The number of white and non-white employees was approximately equal. A random assignment could be expected to result in housing that was about half white and half non-white; yet the assignments did not reflect this ratio. At each cannery, most buildings were either 100% white or 100% non-white. Buildings which whites and non-whites shared are the exception rather than the rule. Most of the so-called integrated houses were 80% or more segregated.

Housing at Egegik is indicative of the pattern. Only two of the ten houses in use during the three years the cannery operated were integrated.[30] The vast majority of non-whites were Native Americans who occupied the same bunkhouse each year, which was 100% non-white.

The pattern of segregation in the statistics is supported by Nefco's company records which refer to the houses in racial terms: "Filipino Bunkhouse", "Native Bunkhouse", and "White Bunkhouse".

Nefco's contention that it consistently assigned housing on the basis of crew and date of arrival at the cannery is not supported by the evidence. In some cases, when Nefco did assign members of the same work crews to the same bunkhouse, even these crew members were segregated by race. For example, at Pederson Point in 1970, Bunkhouses 4A, 38, and 39 housed cannery workers. Bunkhouse 4A contained only white cannery workers, while Bunkhouses 38 and 39 housed only Native American cannery workers. A fourth house, Bunkhouse 32, housed primarily cannery workers; the top floor was 100% white and the bottom floor was 93% non-white, mostly Filipinos. The assignment of cannery workers to these bunkhouses bore no relationship to the date the occupants arrived at the cannery.[31]

Even if Nefco did assign housing on the basis of crew and time of arrival at the cannery, the practice would violate Title VII. Although the practice appears neutral on its face, it has a discriminatory impact on non-whites. When an employer has a "Filipino crew", a "native crew", and a "white crew", housing by crew is tantamount to housing by race. This practice adversely affected employment opportunities for non-whites because job openings were not posted and information on better job openings was passed by word-of-mouth; non-whites were isolated, both on and off the job, from the "web of information" about higher-paying jobs in predominantly white departments.

Nefco asserts that it is economical to house machinists, the beach gang, and carpenters in several bunkhouses in the preseason to minimize heating and maintenance; and once the season starts, it is inconvenient to move these employees. Nefco also asserts that it is efficient to house by crew during the processing season

---

**29.** Table D is derived from Ex. 546, which is the stipulation of the parties on housing assignments. The agreement of the parties was based upon the best information available; in some instances the parties compromised as to the race, number and identity of individuals occupying the living quarters.

The statistics in Table D show occupancy of Nefco employees during the canning season. They do not include individuals who lived at the cannery but who were not Nefco employees, and they do not include pre-season or post-season housing assignments.

**30.** The few non-whites who shared the two "integrated" houses were Japanese or Chinese.

**31.** The situation at Chatham was similar. Bunkhouse 1–1A housed only non-white members of the Local 37 cannery crew. White members occupied Bunkhouse A with an assortment of machinists, clerical workers, quality control workers, laborers, and beach gang workers—most of whom were white. Both white and non-white Local 37 members arrived at the cannery on the same date.

because crews sometimes work and sleep at different times and it is easier for a supervisor to keep track of his crew.

Even if these reasons were supported by the evidence, they do not amount to a business necessity.

I find that Nefco segregated its employees by race in housing assignments and that generally non-whites were supplied inferior housing.

### B. *Messing*

█ Plaintiffs contend that Nefco maintained segregated eating facilities at its canneries.

Nefco contends that it did not assign seating and that where an employee ate was a matter of individual preference. It served two types of food in its eating facilities: American and Oriental. An Oriental menu was added to the traditional American menu because Local 37 requested Oriental food prepared by a separate culinary staff for its members.

Eating facilities at each cannery were different. At Uganik there were two messhalls. One accommodated the Local 37 crew, which was almost entirely Filipino, and was generally known as the "Filipino mess". It was staffed by culinary workers dispatched by Local 37. The food was Oriental. The other messhall, known as the "white mess", accommodated the remainder of the employees, most of whom were white. Alaska Natives also ate there. The food at this messhall was American. An employee could eat in either messhall if he notified the cook in advance and if there was enough food and space to accommodate him.

At Chatham, there were two messhalls from 1970–72. One messhall, the "Filipino mess", was staffed by Local 37 culinary workers who served Oriental food to Local 37 members. The other messhall, the "white mess", served American food. All

employees, except residents of the Village,[32] could take their meals where they wished. In 1973, Nefco built a new messhall at Chatham to accommodate all employees. At the request of Local 37, Nefco hired two culinary staffs to work in the kitchen; one consisted of Local 37 members who prepared Oriental dishes. Both American and Oriental dishes were served at each table. A partition separated the messhall into two rooms. Cannery workers took their meals in one room, the rest in the other room.

At Pederson Point there was one messhall partitioned into several dining rooms. Supervisory personnel and visitors took their meals in one room; the beach gang, machinists, laborers, quality control workers, and a few others took their meals in a second room; female cannery workers and culinary workers took their meals in a third room; and male cannery workers took their meals in a fourth room. Like Chatham, a separate Local 37 staff prepared Oriental dishes, and all employees were served the same food.

At Egegik, there was one dining room. The cannery workers, most of whom were Alaska Natives, had four tables. The superintendent, office workers, beach gang, and machinists had their own table. This arrangement was a matter of tradition. Everyone received the same food.

At Waterfall, there was one dining room where everyone took their meals except those who resided in the Village. Crews generally sat together at the same table, but everyone received the same food.

There is no evidence that Nefco assigned seats in its eating facilities or restricted the place where an employee could take his meals (except residents of the Village). At Chatham, there was a sign posted stating that there were no restrictions on seating.

Although employees were usually segregated by race in the messhalls, this was primarily the result of crews eating together and the desire of Local 37 to have its

---

**32.** Residents of the Village, most of whom were Alaska Natives, were not provided with company meals. Their cabins had cooking facilities, and they purchased food from the cannery store. They received a higher hourly wage than Local 37 members, and they could purchase food at reduced rates.

own food and culinary staff. The tradition of crews eating together was not a company policy; it was based on individual preferences and peer pressure. Those who worked and bunked together also tended to eat together. And individuals and groups established a sense of territoriality about their accustomed seating arrangements.

At those canneries where there were two messhalls, plaintiffs have produced no evidence that the Filipinos were required to take their meals in the "Filipino mess". A number of them took their meals in the "white mess" when they wished.

Although Nefco's policies of job segregation and housing segregation may have contributed to segregation in eating, there is no evidence that Nefco had a direct role.

In this respect, the messhalls are unlike the bunkhouses, which Nefco assigned.

I find that plaintiffs failed to prove Nefco discriminated against non-whites in providing eating facilities for its employees.

Plaintiffs have also failed to prove that Nefco provided inferior food to non-white employees.

## VI. *Conclusion*

I find that Nefco discriminated on the basis of race in the allocation of jobs in violation of Title VII. I also find that Nefco discriminated on the basis of race in housing its employees. But I find that plaintiffs have failed to prove Nefco discriminated in feeding its employees.

TABLE A

EMPLOYEES BY JOB DEPARTMENT AND RACE

1970-75

| Job Department | Number of Positions in Each Department By Race | | Percentage in Each Department By Race | |
|---|---|---|---|---|
| | W | NW | %W | %NW |
| Administrative | 28 | 0 | 100% | 0% |
| Tender | 457 | 21 | 96% | 4% |
| Machinist | 184 | 20 | 90% | 10% |
| Quality Control | 26 | 2 | 93% | 7% |
| Clerical | 84 | 13 | 87% | 13% |
| Miscellaneous | 86 | 35 | 71% | 29% |
| Beach Gang | 151 | 54 | 74% | 26% |
| Culinary | 221 | 85 | 72% | 28% |
| Carpenter | 44 | 32 | 58% | 42% |
| Laborer | 64 | 59 | 52% | 48% |
| Cannery | 370 | 1185 | 24% | 76% |
| | 1715 | 1506 | 53% | 47% |

TABLE B
EMPLOYEES BY JOB CATEGORY AND RACE
1970-75

| Job Title | Number of Positions in Each Category By Race | | Percentage in Each Category By Race | | Median Wages | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | W | NW | %W | %NW | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 |
| ADMINISTRATIVE | | | | | | | | | | |
| Cannery Superintendent[a] | 25 | 0 | 100% | 0% | 15,300 | 15,900 | 15,900 | 16,140 | --[b] | -- |
| Assistant Cannery Superintendent[a] | 3 | 0 | 100% | 0% | 11,000 | 12,000 | -- | -- | -- | -- |
| Administrative Department | 28 | 0 | 100% | 0% | | | | | | |
| TENDER | | | | | | | | | | |
| Captain | 106 | 9 | 92% | 8% | 7,110 | 5,262 | 5,965 | 4,850 | 8,019 | 9,228 |
| Mate/Deckhand | 71 | 2 | 97% | 3% | 3,921 | 4,086 | 3,667 | 5,215 | 5,672 | 4,308 |
| First Engineer | 3 | 0 | 100% | 0% | -- | 5,124 | 2,542 | -- | -- | -- |
| Engineer | 104 | 4 | 96% | 4% | 5,755 | 3,699 | 5,413 | 3,822 | 8,676 | 6,880 |
| Cook[c] | 84 | 4 | 96% | 4% | 2,733 | 2,494 | 2,512 | 2,644 | 3,297 | 3,990 |
| Deckhand | 52 | 2 | 96% | 4% | 2,733 | 2,494 | 2,512 | 2,644 | 3,297 | 3,990 |
| Tendermen - undifferentiated | 9 | 0 | 100% | 0% | -- | 8,569 | 5,184 | 1,586 | -- | -- |
| Tallyman | 28 | 0 | 100% | 0% | 2,461 | 1,575 | 1,356 | 1,940 | -- | 817 |
| Tender Department | 457 | 21 | 96% | 4% | | | | | | |
| CLERICAL | | | | | | | | | | |
| Office Manager[d] | 21 | 2 | 91% | 9% | 9,360 | 11,375 | 11,496 | 11,400 | -- | -- |
| Assistant Office Manager[a] | 0 | 5 | 0% | 100% | 7,939 | 9,321 | 10,036 | -- | -- | -- |
| Seasonal Office Worker | 24 | 3 | 89% | 11% | 1,750 | 1,337 | 2,387 | 2,082 | 2,267 | 3,852 |
| Assistant Storekeeper | 11 | 1 | 92% | 8% | 1,397 | 1,944 | 1,744 | 681 | -- | 4,197 |
| Storekeeper | 28 | 2 | 93% | 7% | 1,176 | 1,889 | 2,000 | 1,949 | 2,770 | 2,410 |
| Clerical Department | 84 | 13 | 87% | 13% | | | | | | |
| QUALITY CONTROL | | | | | | | | | | |
| Qualify Control | 26 | 2 | 93% | 7% | 1,860 | 1,788 | 1,591 | 2,552 | 1,648 | 2,931 |
| Quality Control Department | 26 | 2 | 93% | 7% | | | | | | |

[a] Year-round position.

[b] Wage information not available.

[c] Some of the cooks listed in the culinary department may actually be tender cooks. Plaintiffs did not have enough information to separate them from the shore cooks.

TABLE B - Page 2
EMPLOYEES BY JOB CATEGORY AND RACE
1970-75

| Job Title | Number of Positions in Each Category By Race | | Percentage in Each Category By Race | | Median Wages | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | W | NW | %W | %NW | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 |
| **MACHINIST** (Continued) | | | | | | | | | | |
| Cannery Foreman | 15 | 0 | 100% | 0% | 7,793 | 8,250 | 9,468 | 6,949 | -- | -- |
| First Machinist | 16 | 0 | 100% | 0% | 7,041 | 7,029 | 6,816 | 5,540 | 6,922 | -- |
| Machinist - Undifferentiated | 13 | 2 | 87% | 13% | 4,572 | 4,974 | 5,283 | -- | -- | 9,858 |
| Salmon Cook/Pipefitter | 19 | 0 | 100% | 0% | 5,684 | 5,881 | 6,814 | 6,498 | 5,443 | 6,989 |
| Port Engineer | 34 | 7 | 83% | 17% | 6,048 | 6,348 | 7,689 | 5,777 | 4,707 | 3,010 |
| Seamer Machinist | 10 | 0 | 100% | 0% | 6,049 | 4,890 | 5,448 | -- | 4,294 | -- |
| Reform Man | 20 | 0 | 100% | 0% | 5,795 | 5,205 | 4,850 | 5,655 | 3,704 | -- |
| Salmon Butchering Machinist | 9 | 4 | 69% | 31% | 5,474 | 4,895 | 7,053 | 5,113 | 4,986 | 7,311 |
| Electrician | 9 | 4 | 69% | 31% | 6,900 | 6,205 | 6,860 | 4,939 | 7,755 | 22,079 |
| Fireman | 5 | 0 | 100% | 0% | 5,146 | 4,053 | 5,384 | 4,468 | -- | -- |
| Shop Machinist | 3 | 0 | -- | -- | -- | -- | -- | 3,350 | -- | -- |
| Caseup/Case Labelling Mach | 3 | 0 | -- | -- | -- | 3,602 | 3,564 | -- | -- | -- |
| Machinist Trainee | 8 | 2 | 80% | 20% | 3,938 | 2,938 | 2,777 | 3,225.5 | 2,971 | 1,955 |
| Machinist Helper | 20 | 1 | 95% | 5% | 2,891 | 3,609 | 4,255 | 3,191 | -- | 4,538 |
| Machinist Department | 184 | 20 | 90% | 10% | | | | | | |
| **BEACH GANG** | | | | | | | | | | |
| Beach Boss | 20 | 1 | 95% | 5% | 5,293 | 8,629 | 8,113 | 7,728 | 5,436 | 4,558 |
| Beachman | 131 | 53 | 71% | 29% | 2,343 | 2,222 | 2,717 | 3,024 | 2,881 | 2,771 |
| Beach Gang Department | 151 | 54 | 74% | 26% | | | | | | |
| **CARPENTER** | | | | | | | | | | |
| Carpenter Foreman | 6 | 4 | 60% | 40% | 12,895 | 6,597 | 1,675 | 6,291 | 3,252 | 4,376 |
| Carpenter/Asst. Carpenter | 32 | 26 | 55% | 45% | 2,459 | 8,214 | 4,521 | 3,996 | 4,199 | 4,434 |
| Preseason Carpenter | 3 | 1 | 75% | 25% | -- | 2,766 | -- | -- | -- | -- |
| Roofer | 3 | 1 | 75% | 25% | -- | -- | 2,535 | 2,500 | 2,499 | -- |
| Carpenter Department | 44 | 32 | 58% | 42% | | | | | | |
| **CANNERY** | | | | | | | | | | |
| Foremen | | | | | | | | | | |
| First Foreman | 4 | 12 | 25% | 75% | 3,517 | 3,504 | 3,276 | 3,636 | 4,186 | -- |
| Second Foreman | 0 | 13 | 0% | 100% | 2,588 | 2,605 | 2,759 | 2,819 | 3,202 | 4,091 |
| Resident Cannery Worker Fmn | 0 | 5 | 0% | 100% | 3,444 | 2,981 | 1,800 | -- | -- | -- |
| Foremen | 4 | 30 | 12% | 88% | | | | | | |

TABLE B – Page 3
EMPLOYEES BY JOB CATEGORY AND RACE
1970–75

| Job Title | Number of Positions in Each Category By Race | | Percentage in Each Category By Race | | Median Wages | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | W | NW | %W | %NW | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 |
| **Fish House** (Continued) | | | | | | | | | | |
| Slimer | 2 | 152 | 2% | 98% | 1,290 | 1,357 | 1,143 | 1,216 | 1,056 | 2,151 |
| Butcher | 1 | 112 | 1% | 99% | 1,445 | 1,499 | 1,583 | 1,461 | 1,546 | 2,507 |
| Fish Boss | 0 | 4 | 0% | 100% | — | — | 3,600 | 3,600 | 3,600 | 3,000 |
| Head Lineman | 0 | 2 | 0% | 100% | 1,526 | 1,644 | — | 1,281 | 722 | 1,797 |
| Egg Puller | 8 | 47 | 14% | 86% | 1,328 | 1,388 | 1,178 | 1,583 | 1,467 | 3,247 |
| Relief | 3 | 11 | 21% | 79% | 1,502 | 1,466 | 1,404 | 1,238 | 1,404 | 1,734 |
| Cooler Loader | 3 | 43 | 6% | 94% | 1,215 | 1,548 | 1,313 | 1,397 | 1,551 | — |
| Retort/Lye Wash | 5 | 41 | 11% | 89% | 1,573 | 1,610 | 1,396 | 1,449 | — | 2,260 |
| Head Egg Puller | 2 | 0 | 100% | 0% | 1,345 | 1,801 | 1,419 | 1,270 | 1,430 | — |
| Filler Feeder | 6 | 22 | 78% | 22% | 671 | 1,212 | 927 | 1,351 | 1,511 | — |
| Cooler Supply | 2 | 4 | 33% | 67% | — | 1,561 | 1,343 | 1,356 | — | — |
| Sorter | 1 | 27 | 4% | 96% | 1,345 | 1,801 | 1,419 | 1,306 | 1,420 | 2,461 |
| Hand Butcher | 1 | 11 | 8% | 92% | 1,417 | 1,590 | 1,331 | 1,302 | 1,575 | — |
| Clincher | 1 | 1 | 50% | 50% | 901 | — | — | 1,287 | 722 | — |
| Inverter | 0 | 7 | 0% | 100% | 1,286 | 1,636 | 1,240 | — | 1,564 | — |
| Salt Supply | 0 | 1 | 0% | 100% | 1,258 | — | — | — | — | — |
| Bin Man | 37 | 13 | 46% | 54% | 1,192 | 1,773 | 1,436 | 1,344 | — | — |
| Patcher | 1 | 44 | 11% | 89% | 938 | 1,210 | 772 | 1,223 | — | 1,908 |
| Inspector | 0 | 8 | 0% | 100% | 1,354 | 1,391 | 1,018 | 1,216 | — | — |
| Chopper | 0 | 10 | 0% | 100% | 1,452 | 1,351 | 1,156 | 1,310 | — | — |
| Head Lye Wash | 0 | 4 | 0% | 100% | 2,314 | 1,817 | 1,191 | — | — | — |
| **Fish House Division** | 73 | 564 | 11% | 89% | | | | | | |
| **Can Loft** | | | | | | | | | | |
| Can Supply | 1 | 3 | 25% | 75% | — | 1,403 | 1,106 | 1,983 | 1,792 | 2,322 |
| Reform | 3 | 20 | 13% | 87% | 1,084 | — | 825 | 1,281 | — | 5,006 |
| Can Loft | 9 | 8 | 53% | 47% | — | 1,158 | 5,490 | 1,230 | 1,404 | — |
| Seamer | 2 | 3 | 40% | 60% | 671 | — | — | — | — | 3,395 |
| **Can Loft Division** | 15 | 34 | 31% | 69% | | | | | | |
| **Egg Department** | | | | | | | | | | |
| Egg Department Supervisor | 9 | 4 | 69% | 31% | 213 | 1,937 | 3,045 | 2,681 | 2,079 | 5,596 |
| Egg Department | 72 | 74 | 49% | 51% | 1,084 | 1,257 | 1,238 | 765 | 1,436 | 895 |
| Egg Packer | 0 | 1 | 0% | 100% | 200 | — | — | — | — | — |
| **Egg Department** | 81 | 79 | 51% | 49% | | | | | | |

TABLE B - Page 4
EMPLOYEES BY JOB CATEGORY AND RACE
1970-75

| Job Title | Number of Positions in Each Category By Race | | Percentage in Each Category By Race | | Median Wages | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| (Continued) | W | NW | %W | %NW | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 |
| **Warehouse** | | | | | | | | | | |
| Caseup | 3 | 15 | 17% | 83% | 1,246 | 1,810 | 40 | 1,375 | 1,462 | 2,435 |
| Forklift | 4 | 20 | 17% | 83% | 1,379 | 1,655 | 1,795 | — | 2,119 | 1,403 |
| Warehouse | 8 | 22 | 27% | 73% | 1,183 | 1,484 | 1,259 | 1,715 | 1,884 | 3,300 |
| Head Warehouse | 1 | 8 | 11% | 89% | 1,746 | 1,409 | 1,793 | — | 2,119 | 1,403 |
| Airlift | 2 | 0 | 100% | 0% | — | 1,737 | 1,621 | — | — | — |
| Britestack Supervisor | 1 | 0 | 100% | 0% | — | | | | | |
| Warehouse Division | 19 | 65 | 23% | 77% | | | | | | |
| **Unspecified** | | | | | | | | | | |
| Class A-Undifferentiated | 13 | 51 | 20% | 80% | 1,236 | 1,339 | 1,215 | 1,295 | — | — |
| Cannery Worker – Undifferentiated | 165 | 362 | 31% | 69% | 1,125 | 1,014 | 930 | 500 | 1,650 | 625 |
| **Cannery Department – Total** | 370 | 1185 | 24% | 76% | | | | | | |
| **LABORER** | | | | | | | | | | |
| Cleanup/Cleanup Foreman | 40 | 6 | 87% | 13% | 1,851 | 1,305 | 1,605 | 2,041 | 1,735 | 3,439. |
| Maintenance | 5 | 9 | 36% | 64% | 2,000 | — | — | — | — | — |
| Off-season Labor | 19 | 45 | 27% | 73% | 576 | 591 | 265 | 299 | 546 | 368 |
| **Laborer Department** | 64 | 59 | 52% | 48% | | | | | | |
| **CULINARY AND HOUSEKEEPING** | | | | | | | | | | |
| Steward | 3 | 0 | 100% | 0% | 1,590 | 5,793 | 4,019 | 3,023 | 3,320 | 4,490 |
| First Cook | 12 | 15 | 45% | 55% | 2,869 | 3,394 | 3,729 | 2,690 | 3,413 | 2,779 |
| Second Cook/Baker | 8 | 2 | 78% | 22% | 397 | 4,843 | 3,481. | 2,218 | 183 | 3,169 |
| Cook | 39 | 2 | 95% | 5% | 3,405 | 1,571 | 1,586 | 3,583 | 5,071 | 5,816 |
| Baker | 9 | 1 | 90% | 10% | 3,708 | 2,683 | 3,907 | 2,504 | 1,741 | 3,336 |
| Bullcook | 27 | 18 | 60% | 40% | 1,565 | 2,309 | 1,511 | 1,334 | — | 2,069 |
| Laundry | 7 | 4 | 64% | 36% | 4,066 | 2,387 | 2,184 | 1,754 | 3,102 | 2,553 |
| Culinary | 102 | 32 | 76% | 24% | 2,087 | 1,949 | 1,600 | 2,054 | 2,627 | 5,726 |
| Second Cook | 12 | 10 | 55% | 45% | 2,655 | 1,949 | 2,900 | 1,125 | — | — |
| Night Cook | 2 | 1 | 67% | 33% | 3,631 | 3,667 | — | — | — | — |
| **Culinary & Housekeeping Department** | 221 | 85 | 72% | 28% | | | | | | |

TABLE B – Page 5
EMPLOYEES BY JOB CATEGORY AND RACE
1970-75

| Job Title | Number of Positions in Each Category By Race | | Percentage in Each Category By Race | | Median Wages | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | W | NW | %W | %NW | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 |
| **MISCELLANEOUS** (Continued) | | | | | | | | | | |
| Freezer Department | 17 | 3 | 85% | 15% | 1,301 | 1,593 | 1,203 | — | 3,032 | — |
| Plumber | 1 | 1 | 50% | 50% | — | — | — | 6,098 | — | 1,029 |
| Winter Watch | 28 | 18 | 60% | 40% | 2,150 | 2,000 | 1,912 | 2,384 | 2,323 | 2,394 |
| Nurse | 2 | 0 | 100% | 0% | 3,456 | 5,485 | — | — | — | — |
| Watchman | 13 | 6 | 84% | 16% | 2,901 | 1,929 | 1,523 | 1,461 | 3,111 | 1,842 |
| Freezer Foreman | 2 | 2 | 50% | 50% | — | 4,863 | — | — | 3,300 | 5,336 |
| Set Net Pickup | 1 | 0 | 100% | 0% | 4,743 | — | — | — | — | — |
| Truck Driver | 3 | 1 | 75% | 25% | — | 3,964 | — | — | — | — |
| Longshore | 1 | 1 | 50% | 50% | 608 | — | — | — | — | — |
| Oilman | 4 | 0 | 100% | 0% | 2,380 | 1,580 | — | 2,138 | 2,890 | — |
| Weigher | 3 | 0 | 100% | 0% | 1,930 | 1,676 | — | — | — | — |
| Plumber's Helper | 4 | 0 | 100% | 0% | 1,751 | — | — | — | — | — |
| Utility | 2 | 0 | 100% | 0% | — | 4,361 | 420 | — | — | — |
| Web Man | 1 | 1 | 50% | 50% | — | 1,623 | — | 192 | — | — |
| Trans Op. | 1 | 0 | 100% | 0% | — | — | 1,188 | — | — | — |
| Strapper | 3 | 2 | 60% | 40% | 1,923 | 4,896 | — | — | — | — |
| Miscellaneous | 86 | 35 | 71% | 29% | | | | | | |

TABLE C-1

TRANSFERS ACROSS DEPARTMENT LINES

1970-75

| Transfer | W | NW |
|---|---|---|
| Clerical to Tender | 1 | 0 |
| Tender to Machinist | 2 | 0 |
| Machinist to Tender | 2 | 0 |
| Culinary to Clerical | 3 | 0 |
| Beachgang to Tender | 9 | 1 |
| Cannery Worker to Tender | 4 | 0 |
| Miscellaneous to Machinist | 3 | 0 |
| Miscellaneous to Tender | 4 | 1 |
| Tender to Administrative | 1 | 0 |
| Cannery Worker to Clerical | 2 | 0 |
| Culinary to Machinist | 1 | 0 |
| Culinary to Tender | 7 | 0 |
| Laborer to Machinist | 1 | 0 |
| Cannery Worker to Machinist | 0 | 1 |
| Miscellaneous to Quality Control | 1 | 0 |
| | 41 | 3 |

TABLE C-2

TRANSFERS ACROSS DEPARTMENT LINES

1970-75

| Transfer | W | NW |
|----------|----|-----|
| Cannery to Culinary | – | 6 |
| Cannery to Beach Gang | – | 4 |
| Cannery to Laborer | – | 1 |
| Cannery to Miscellaneous | – | 1 |
| Beach Gang to Cannery | – | 3 |
| Laborer to Beach Gang | – | 2 |
| Laborer to Cannery | – | 1 |
| Laborer to Carpenter | – | 1 |
| Carpenter to Beach Gang | – | 1 |
| Miscellaneous to Beach Gang | – | 3 |
| Miscellaneous to Tender | – | 1 |
| Miscellaneous to Carpenter | – | 1 |
| Tender to Cannery | – | 1 |
| | – | 26 |

TABLE D
Housing By Cannery 1970-75
EGEGIK CANNERY

| | 1970 | | | 1971 | | | 1972 | | | 1973 [d] | | | 1974 [d] | | | 1975 [d] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. |
| Bunkhouse 1 | 2 | 0 | 100% | 4 | 0 | 100% | 3 | 0 | 100% | 1 | 0 | 100% | - | - | - | - | - | - |
| Bunkhouse 2 [e] | 0 | 48 | 100% | 0 | 37 | 100% | 0 | 43 | 100% | - | - | - | - | - | - | - | - | - |
| Bunkhouse 3 | 10 | 0 | 100% | 7 | 0 | 100% | 10 | 0 | 100% | 4 | 0 | 100% | - | - | - | 7 | 0 | 100% |
| Bunkhouse 4 | 6 | 0 | 100% | 5 | 0 | 100% | 5 | 0 | 100% | 2 | 0 | 100% | - | - | - | - | - | - |
| Store Bldg. | 11 | 1 | 91% | 6 | 3 | 66% | 6 | 5 | 54% | 3 | 0 | 100% | 2 | 0 | 100% | 3 | 0 | 100% |
| Cabin 1 | 3 | 1 | 75% | 3 | 1 | 75% | 2 | 2 | 50% | 3 | 0 | 100% | - | - | - | 3 | 0 | 100% |
| Cabin 2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cabin 3 | 4 | 0 | 100% | 5 | 0 | 100% | 5 | 0 | 100% | 4 | 0 | 100% | - | - | - | 3 | 0 | 100% |
| Duplex | 2 | 0 | 100% | 2 | 0 | 100% | - | - | - | - | - | - | - | - | - | - | - | - |
| Supt's House | 3 | 0 | 100% | 3 | 0 | 100% | 4 | 0 | 100% | 2 | 0 | 100% | 3 | 0 | 100% | 2 | 0 | 100% |
| Oil Dock | 1 | 0 | 100% | 1 | 0 | 100% | 1 | 0 | 100% | - | - | - | - | - | - | - | - | - |

[d] There were no canning operations at the facility during this season.

[e] The parties disagree on the race of one occupant.

PEDERSON POINT CANNERY

| | 1970 | | | 1971 | | | 1972 d | | | 1973 d | | | 1974 d | | | 1975 d | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. |
| Bunkhouse 4 f | 24 | 0 | 100% | 21 | 1 | 95% | 6 | 0 | 100% | 3 | 0 | 100% | 6 | 0 | 100% | 10 | 1 | 90% |
| Bunkhouse 4A | 15 | 0 | 100% | 13 | 0 | 100% | - | - | - | - | - | - | - | - | - | - | - | - |
| Bunkhouse 30 | 4 | 0 | 100% | 4 | 0 | 100% | 5 | 0 | 100% | 6 | 0 | 100% | - | - | - | 6 | 0 | 100% |
| Bunkhouse 32 | | | | | | | | | | | | | | | | | | |
| First Floor | 5 | 62 | 93% | 3 | 64 | 96% | - | - | - | - | - | - | - | - | - | - | - | - |
| Second Floor | 24 | 0 | 100% | 32 | 2 | 94% | - | - | - | - | - | - | - | - | - | - | - | - |
| Bunkhouse 33 | 6 | 0 | 100% | 6e | 0 | 100% | 7 | 0 | 100% | - | - | - | - | - | - | - | - | - |
| Bunkhouse 37 f | 28 | 11 | 72% | 27 | 4 | 87% | - | - | - | - | - | - | - | - | - | - | - | - |
| Bunkhouse 38 | 0 | 66 | 100% | 0 | 51 | 100% | - | - | - | - | - | - | - | - | - | - | - | - |
| Bunkhouse 39 f | 0 | 37 | 100% | - | - | - | 13 | 8 | 60% | 7 | 2 | 80% | - | - | - | - | - | - |
| Bunkhouse 41 | 7 | 1 | 88% | 7 | 1 | 88% | 5 | 0 | 100% | 4 | 0 | 100% | - | - | - | 3 | 0 | 100% |
| Bunkhouse 42 | 0 | 25 | 100% | 14 | 0 | 100% | - | - | - | - | - | - | - | - | - | - | - | - |
| Bunkhouse 43 | 22 | 0 | 100% | 14 | 0 | 100% | 3 | 0 | 100% | 4 | 0 | 100% | - | - | - | - | - | - |
| Bunkhouse 46 | 0 | 2 | 100% | 0 | 2 | 100% | 0 | 2 | 100% | 1 | 0 | 100% | 0 | 1 | 100% | - | - | - |
| Bunkhouse 47 | 2 | 0 | 100% | 2 | 0 | 100% | 1 | 0 | 100% | 1 | 0 | 100% | - | - | - | - | - | - |
| Bunkhouse 50 | 1 | 0 | 100% | 2 | 0 | 100% | 1 | 0 | 100% | 1 | 0 | 100% | 1 | 0 | 100% | 2 | 0 | 100% |

d There were no canning operations at the facility during this season.

e The parties disagree on the race of one occupant.

f Includes only steady bunkhouse residents; does not include individuals who lived part-time in a neighboring town.

UGANIK CANNERY

| | 1970 | | | 1971 | | | 1972 | | | 1973 | | | 1974[d] | | | 1975 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. |
| Above Office | 0 | 7 | 100% | 0 | 7 | 100% | 0 | 9 | 100% | 0 | 8 | 100% | – | – | – | 0 | 4 | 100% |
| Bunkhouse 2 | 19 | 6 | 76% | 21 | 4 | 84% | 21 | 5 | 81% | 16 | 7 | 70% | 9 | 2 | 82% | 20 | 3 | 83% |
| Bunkhouse 3 & Bottom floor | 27 | 0 | 100% | 22 | 4 | 84% | 20 | 2 | 90% | 19[e] | 2 | 90% | – | – | – | 0 | 23 | 100% |
| Top floor | 17 | 9 | 65% | 20 | 4 | 83% | 15 | 5 | 75% | 14 | 6 | 76% | – | – | – | 19 | 2 | 95% |
| Bunkhouse 4 | – | – | – | – | – | – | – | – | – | 20 | 3 | 87% | 13 | 7 | 65% | 20 | 8 | 71% |
| Bunkhouse 5 | 7 | 55 | 89% | 2 | 37 | 95% | 4 | 50 | 93% | 4 | 45 | 92% | – | – | – | 2 | 32 | 94% |
| Building 6 | 1 | 0 | 100% | 0 | 1 | 100% | 1 | 0 | 100% | 1 | 0 | 100% | – | – | – | 1 | 0 | 100% |
| Building 7 | 1 | 0 | 100% | 1 | 0 | 100% | – | – | – | 1 | 0 | 100% | – | – | – | 1 | 0 | 100% |
| Building 8 | 5 | 1 | 92% | 1 | 1 | 50% | 1 | 1 | 50% | 1 | 0 | 100% | 1 | 1 | 50% | 2 | 0 | 100% |
| Building 9 | 1 | 0 | 100% | 2 | 0 | 100% | 3 | 0 | 100% | 2 | 0 | 100% | 2 | 0 | 100% | 2 | 0 | 100% |
| Building 10 | 0 | 6 | 100% | 0 | 6 | 100% | 0 | 6 | 100% | 0 | 6 | 100% | – | – | – | – | – | – |
| Herring Plant | 1 | 0 | 100% | – | – | – | 2 | 0 | 100% | 2 | 0 | 100% | 1 | 1 | 50% | 1 | 0 | 100% |
| Supt's House | 6 | 0 | 100% | 6 | 0 | 100% | 3 | 0 | 100% | 4 | 0 | 100% | 4 | 0 | 100% | 4 | 0 | 100% |
| Guest House | 0 | 1 | 100% | – | – | – | 2 | 0 | 100% | 1 | 0 | 100% | 1 | 1 | 50% | 2 | 0 | 100% |

[d] There were no canning operations at the facility during this season.

[e] The parties disagree on the race of one occupant.

[g] Women were housed on the top floor; men were housed on the bottom floor.

CHATHAM CANNERY

| | 1970 | | | 1971 | | | 1972 | | | 1973 | | | 1974 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. |
| Bunkhouse A | 25 | 2 | 93% | 22 | 3 | 88% | 29 | 7 | 81% | 17 | 8 | 68% | 13 | 15 | 54% |
| Bunkhouses 1-1A | 0 | 59 | 100% | 0 | 53 | 100% | 0 | 54 | 100% | 0 | 46 | 100% | 0 | 23 | 100% |
| House 2 | 1 | 0 | 100% | 1 | 0 | 100% | 2 | 0 | 100% | 2 | 0 | 100% | 2 | 0 | 100% |
| House 3 | 1 | 1 | 50% | 1 | 1 | 50% | 1 | 0 | 100% | 1 | 1 | 50% | 1 | 1 | 50% |
| Bunkhouse 3 | - | - | - | - | - | - | - | - | - | 10 | 2 | 83% | 9 | 5 | 62% |
| Bunkhouse 4 | 2 | 0 | 100% | 2 | 0 | 100% | 2 | 0 | 100% | 0 | 5 | 100% | 0 | 5 | 100% |
| Nightwatchman's House | 1 | 0 | 100% | 0 | 1 | 100% | 0 | 1 | 100% | 0 | 1 | 100% | 0 | 1 | 100% |
| Superintendent's House | 2 | 0 | 100% | 3 | 0 | 100% | 6 | 0 | 100% | 5 | 0 | 100% | 4 | 0 | 100% |
| The Village Duplex 1 | 0 | 6 | 100% | 0 | 4 | 100% | 0 | 2 | 100% | 0 | 1 | 100% | 0 | 2 | 100% |
| Duplex 2 | 0 | 4 | 100% | 0 | 5 | 100% | 0 | 4 | 100% | 0 | 4 | 100% | 0 | 6 | 100% |
| Fourplex 11 | 1 | 0 | 100% | 2 | 0 | 100% | 2 | 0 | 100% | 1 | 0 | 100% | 1 | 0 | 100% |
| Fourplex 12 | - | - | - | - | - | - | - | - | - | 2 | 0 | 100% | 2 | 0 | 100% |
| Fourplex 13 | 0 | 3 | 100% | 0 | 2 | 100% | 0 | 2 | 100% | 4 | 0 | 100% | 0 | 3 | 100% |
| Fourplex 14 | 0 | 1 | 100% | 0 | 1 | 100% | 0 | 1 | 100% | 0 | 1 | 100% | - | - | - |
| Fourplex 15 | 0 | 1 | 100% | 0 | 1 | 100% | 0 | 1 | 100% | - | - | - | - | - | - |
| Cabin 1 | - | - | - | 0 | 3 | 100% | - | - | - | 0 | 1 | 100% | 0 | 1 | 100% |
| Cabin 2 | 0 | 1 | 100% | - | - | - | - | - | - | - | - | - | - | - | - |
| Cabin 3 | 2 | 4 | 67% | 0 | 2 | 100% | 0 | 2 | 100% | 0 | 2 | 100% | 0 | 2 | 100% |

CHATHAM CANNERY (Continued)

| | 1970 | | | 1971 | | | 1972 | | | 1973 | | | 1974 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. | W | NW | %Seg. |
| Cabin 5 | 0 | 2 | 100% | 2 | 0 | 100% | - | - | - | - | - | - | - | - | - |
| Cabin 6 | 0 | 2 | 100% | 0 | 2 | 100% | 0 | 1 | 100% | - | - | - | - | - | - |
| Cabin 7 | 0 | 2 | 100% | 0 | 1 | 100% | 0 | 1 | 100% | 0 | 1 | 100% | 0 | 1 | 100% |
| Cabin 17 | 0 | 2 | 100% | 0 | 2 | 100% | 0 | 2 | 100% | 0 | 5 | 100% | - | - | - |
| Cabin 18 | 0 | 1 | 100% | 0 | 1 | 100% | 0 | 1 | 100% | 1 | 0 | 100% | - | - | - |
| Cabin 20 | 0 | 1 | 100% | 0 | 1 | 100% | 0 | 1 | 100% | 0 | 1 | 100% | - | - | - |
| Cabin 21 | - | - | 50% | 1 | 1 | 50% | - | - | - | - | - | - | - | - | - |
| Cabin 22 | - | - | 100% | - | - | - | - | - | - | 0 | 3 | 100% | - | - | - |
| Cabin 22A | - | - | - | 0 | 2 | 100% | 0 | 2 | 100% | 0 | 2 | 100% | - | - | - |
| Cabin 24 | 1 | 2 | 67% | - | - | ⌐ | - | - | - | 0 | 1 | 100% | - | - | - |
| Cabin 25 | - | - | 100% | 0 | 2 | 100% | - | - | - | 0 | 1 | 100% | - | - | - |
| Cabin A | 0 | 2 | 100% | 0 | 2 | 100% | 0 | 2 | 100% | 0 | 3 | 100% | - | - | - |
| Cabin B | 0 | 2 | 100% | 0 | 2 | 100% | - | - | - | - | - | - | 0 | 2 | 100% |
| Cabin C | - | - | - | 0 | 1 | 100% | 0 | 3 | 100% | 2 | 1 | 66% | - | - | - |
| Cabin E | 0 | 1 | 100% | 0 | 2 | 100% | - | - | - | 0 | 2 | 100% | - | - | - |
| Guest Rooms | - | - | - | - | - | - | - | - | - | 2 | 0 | 100% | - | - | - |
| Cabins Unknown h | 6 | 0 | 100% | 4 | 0 | 100% | 10 | 0 | 100% | 6 | 0 | 100% | 0 | 7 | 100% |
| | 0 | 14 | 100% | 0 | 26 | 100% | 0 | 14 | 100% | 0 | 3 | 100% | | | |

h These employees lived two apiece in cabins. The parties do not know to which cabins these employees were assigned. They have stipulated that none of these employees occupied integrated cabins.

WATERFALL CANNERY

| | W | 1970 NW | %Seg. |
|---|---|---|---|
| Bunkhouse 1 | 19 | 4 | 83% |
| Bunkhouse 2 | 1 | 25 | 96% |
| Bunkhouse 3 | 5 | 31 | 86% |
| Bunkhouse 4 | 2 | 0 | 100% |
| Bunkhouse 5 | 2 | 0 | 100% |
| Building 7 | 11 | 0 | 100% |
| Building 8 | 1 | 0 | 100% |
| The Village [1] | 6 | 41 | 87% |

[1] Occupants of The Village lived two apiece in cabins. The parties have been unable to determine how many of the cabins were integrated.